## FIRST NATIONAL BANK OF LOGAN v. WALKER BANK & TRUST CO.

No. 51.   Argued November 7–8, 1966.—Decided December 12, 1966.*

*Theodore S. Perry* argued the cause and filed briefs for petitioner in No. 51. *John J. Wilson* argued the cause for petitioner in No. 73. With him on the briefs was *Charles J. Steele. Richard A. Posner* argued the cause for petitioner in No. 88. With him on the briefs were *Solicitor General Marshall, Assistant Attorney General Douglas, David L. Rose* and *Kathryn H. Baldwin.*

*Joseph S. Jones* argued the cause and filed a brief for respondent in No. 51. *James F. Bell* argued the cause and filed a brief for respondent in Nos. 73 and 88.

*Robert Y. Button,* Attorney General, and *Kenneth C. Patty,* Assistant Attorney General, filed a brief for the Commonwealth of Virginia, as *amicus curiae,* urging

---

*Together with No. 73, *First Security Bank of Utah, N. A.* v. *Commercial Security Bank,* and No. 88, *Saxon, Comptroller of the Currency* v. *Commercial Security Bank,* on certiorari to the United States Court of Appeals for the District of Columbia Circuit.

affirmance in all cases. *Henry T. Wickham* filed a brief for the Virginia Bankers Association, as *amicus curiae,* urging affirmance in Nos. 73 and 88.

MR. JUSTICE CLARK delivered the opinion of the Court.

These cases involve the construction of those portions of the National Bank Act, 44 Stat. 1228, 12 U. S. C. § 36 (c), which authorize a national banking association, with the approval of the Comptroller of the Currency, to establish and operate new branches within the limits of the municipality in which the bank is located, if such operation is "at the time expressly authorized to State banks by the law of the State in question." [1] Two national banks with their main banking houses in Logan and Ogden, Utah, respectively, seek to open branches in those municipalities. The Utah statute prohibits Utah banks, with certain exceptions not here relevant, from establishing branches except by taking over an existing bank which has been in operation for not less than five years. Utah Code Ann., Tit. 7, c. 3, § 6 (1965 Supp.).[2] In No. 51,

---

[1] The National Bank Act, 44 Stat. 1228, 12 U. S. C. §§ 36 (c)(1) and (2) provides:

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks."

[2] Utah Code Ann., Tit. 7, c. 3, § 6 (1965 Supp.), provides:

"*7-3-6. Business conducted at banking house—Branching of offices—Violation of section a misdemeanor.*—The business of every

*First National Bank of Logan* v. *Walker Bank & Trust Co.,* the petitioner seeks to establish a new branch in Logan, where its principal banking house is located, without taking over an established bank. The District Court approved its doing so but the Court of Appeals reversed. 352 F. 2d 90 (C. A. 10th Cir.), *sub nom. Walker Bank & Trust Co.* v. *Saxon.* In No. 73, *First Security Bank of Utah, N. A.* v. *Commercial Security Bank,* and No. 88, *Saxon* v. *Commercial Security Bank,* First Security seeks to establish a new branch in Ogden, in which its home office is situated, without taking over an established bank. The District Court held that state law must be complied with, 236 F. Supp. 457, and the Court of Appeals affirmed in a judgment, without opinion, citing *Walker Bank & Trust Co., supra.* In view of a conflict between these holdings and the decision in *First National Bank of Smithfield* v. *Saxon,* 352 F. 2d 267 (C. A. 4th Cir.), we granted certiorari, and consolidated the three cases for argument. 384 U. S. 925. We affirm the judgments.

1. *The Facts.*

In No. 51, the petitioner maintains its principal banking house in Logan, Utah, which is a second class city

bank shall be conducted only at its banking house and every bank shall receive deposits and pay checks only at its banking house except as hereinafter provided.

. . . . .

"Except in cities of the first class, or within unincorporated areas of a county in which a city of the first class is located, no branch bank shall be established in any city or town in which is located a bank or banks, state or national, regularly transacting a customary banking business, unless the bank seeking to establish such branch shall take over an existing bank. No unit bank organized and operating at a point where there are other operating banks, state or national, shall be permitted to be acquired by another bank for the purpose of establishing a branch until such bank shall have been in operation as such for a period of five years."

under Utah law (Utah Code Ann., Tit. 10, c. 1, § 1 (1953, as amended)), and is therefore subject to § 7–3–6 of the Utah Code, *supra.* It applied to the Comptroller of the Currency for a certificate to establish an "inside" branch office in Logan. At the time of the application there were no other banks with their main banking offices in Logan. However, there were two branches of banks whose home offices were situated outside of Logan, one of which belonged to respondent, Walker Bank & Trust Co., whose home office was located in Salt Lake City. After a hearing, the Comptroller ordered the certificate issued. The respondent subsequently filed this suit seeking a declaratory judgment and injunctive relief against the Comptroller and First National claiming the action of the Comptroller to be void since the proposed branch was not taking over an established bank in Logan, as required by Utah law. The District Court dismissed the complaint. It found "express authority" under Utah law for state banks to establish branch offices in Logan, relying on the general authority of the statute and holding that the subsequent conditions, such as the acquisition of another bank, did not "change the 'express authority' into a lack of authority on the part of State banks or a lack of a statutory expression of such authority, and [did] not add to the Federal statute a requirement that compliance be made by National banks with all State conditions." 234 F. Supp. 74, 78, n. 8. The Court of Appeals reversed, holding that the Congress in enacting § 36 (c)(1) acceded to state law and created "a competitive equality between state and national banks." Finding that the trial court's interpretation was to the contrary, it declared "the proper approach is for the Comptroller to look at all the State law on branch banking not just part of it." 352 F. 2d 90, 94.

In Nos. 73 and 88, the First Security Bank of Utah, a national bank, applied for a certificate from the Comptroller to establish a branch bank in Ogden, where it maintained its principal banking house. Its proposal was to open a new branch and not to take over an existing bank in Ogden. Under Utah law, Ogden is also a second class city and the "take over" provision of § 7–3–6, *supra,* was therefore applicable. Two other banks have their main offices in Ogden. After the Comptroller approved the issuance of the certificate, respondent filed suit in the District Court of the United States for the District of Columbia asking for injunctive and other relief. The District Court imposed all of the restrictions of § 7–3–6 of Utah law on the establishment of national banks and the Court of Appeals for the District of Columbia Circuit affirmed, by a judgment without opinion, but cited the opinion of the 10th Circuit, *Walker Bank & Trust Co., supra.*

## 2. *The National Bank Act: Its Background.*

There has long been opposition to the exercise of federal power in the banking field. Indeed, President Jefferson was opposed to the creation of the first Bank of the United States and President Jackson vetoed the Act of Congress extending the charter of the second Bank of the United States. However, the authority of Congress to act in the field was resolved in the landmark case of *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819). There Chief Justice Marshall, while admitting that it does not appear that a bank was in the contemplation of the Framers of the Constitution, held that a national bank could be chartered under the implied powers of the Congress as an instrumentality of the Federal Government to implement its fiscal powers. The paramount power of the Congress over national banks has, therefore, been settled for almost a century and a half.

Nevertheless, no national banking act was adopted until 1863 (12 Stat. 665), and it was not until 1927 that Congress dealt with the problem before us in these cases. This inaction was possibly due to the fact that at the turn of the century, there were very few branch banks in the country. At that time only five national and 82 state banks were operating branches with a total of 119 branches. By the end of 1923, however, there were 91 national and 580 state banks with a total of 2,054 branches.[3] The Comptroller of the Currency, in his Annual Report of 1923, recommended congressional action on branch banking. The report stated that if state banks continue to engage "in unlimited branch banking it will mean the eventual destruction of the national banking system . . . ." H. R. Doc. No. 90, 68th Cong., 1st Sess., 6 (1924). Soon thereafter legislation was introduced to equalize national and state branch banking. The House Report on the measure, H. R. Rep. No. 83, 69th Cong., 1st Sess., 7 (1926), stated among other things:

"The bill recognizes the absolute necessity of taking legislative action with reference to the branch banking controversy. The present situation is intolerable to the national banking system. The bill proposes the only practicable solution by stopping the further extension of state-wide branch banking in the Federal reserve system by State member banks and by permitting national banks to have branches in those cities where State banks are allowed to have them under State laws."

This bill failed to pass in the Senate and, although Congress continued to study the problem, it was not until

---

[3] Board of Governors of the Federal Reserve System, Banking Studies 15, 428 (1941).

258

1927 that the McFadden Act was adopted. The bill originated in the House and, in substance, proposed that both national and state banks be permitted to establish "inside" branches within the municipality of their main banking facilities. in those States that permitted branch banking at the time of the enactment of the bill. H. R. Rep. No. 83, 69th Cong., 1st Sess., 4–5 (1926). The intent of the Congress to leave the question of the desirability of branch banking up to the States is indicated by the fact that the Senate struck from the House bill the time limitation, thus permitting a subsequent change in state law to have a corresponding effect on the authority of national banks to engage in branching. The Senate Report concluded that the Act should permit "national banks to have branches in those cities where State banks are allowed to have them under State laws." S. Rep. No. 473, 69th Cong., 1st Sess., 14 (1926). In the subsequent Conference Committee, the Senate position was adopted. State banks which were members of the Federal Reserve System were also limited to "inside" branches. A grandfather clause permitted retention of branches operated at the date of enactment. H. R. Rep. No. 1481, 69th Cong., 1st Sess., 6 (1926). The Act was finally passed on February 25, 1927, and became known as the McFadden Act of 1927, taking its name from its sponsor, Representative McFadden. At the time of its enactment he characterized it in this language:

> "As a result of the passage of this act, the national bank act has been so amended that national banks are able to meet the needs of modern industry and commerce and *competitive equality* has been established among all member banks of the Federal reserve system." (Emphasis added.) 68 Cong. Rec. 5815 (1927).

During the economic depression there was much agitation that bank failures were due to small undercapitalized rural banks and that these banks should be supplanted by branches of larger and stronger banks. The Comptroller of the Currency advocated that national banks be permitted to branch regardless of state law. Hearings before a Subcommittee of the Senate Committee on Banking and Currency pursuant to S. Res. No. 71, 71st Cong., 3d Sess., 7–10 (1931). Senator Carter Glass held a similar belief and introduced a bill that would authorize national banks to organize branches irrespective of state law beyond and "outside" the municipality of its principal banking house. His proposal was strenuously opposed and was eventually defeated. It was not until the Seventy-third Congress that the Banking Act of 1933 was adopted. Senator Glass, the ranking member of the Senate Committee on Banking and Currency and the dominant banking figure in the Congress, was sponsor of the Act. In reporting it to the Senate for passage, he said, the Act "required that the establishment of branch banks by national banks in States which by law permit branch banking should be under the regulations required by State law of State banks." 77 Cong. Rec. 3726 (1933). In a colloquy on the floor of the Senate with Senator Copeland as to the purpose of the Act (with reference to branch banking by national banks), Senator Glass said that it would be permissible "in only those States the laws of which permit branch banking, and only to the extent that the State laws permit branch banking." Moreover, to make it crystal clear, when Senator Copeland replied that "it permits branch banking only in those States where the State laws permit branch banking by State banks," Senator Glass was careful to repeat: *"Only in those States and to the extent that the State laws permit branch banking."* (Emphasis added.) 76 Cong. Rec. 2511 (1933). Remarks of other

members of Congress also indicate that they shared the understanding of Senator Glass. For example, Senator Vandenberg stated that § 36 (c)(1) provides "that the branch-banking privilege so far as national banks are concerned shall follow the status established by State law in respect to the State privilege." 76 Cong. Rec. 2262 (1933). Likewise, Senator Long, who had joined a filibuster against an earlier version of the bill, stated at final passage that "[w]e have only undertaken to secure equal treatment for State banks" and that the bill had substantially achieved that result. 77 Cong. Rec. 5862 (1933). In similar tone, Representative Bacon stated that branches of national banks may be established provided "this is permitted by the laws of that State and *subject to them.*" (Emphasis added.) 77 Cong. Rec. 3949 (1933). And Representative Luce, a member of the Conference Committee, reported to the House:

> "In the controversy over the respective merits of what are known as 'unit banking' and 'branch banking systems,' a controversy that has been alive and sharp for years, branch banking has been steadily gaining in favor. It is not, however, here proposed to give the advocates of branch banking any advantage. We do not go an inch beyond saying that the two ideas shall compete on equal terms and only where the States make the competition possible by letting their own institutions have branches." 77 Cong. Rec. 5896 (1933).

As finally passed, the Act permitted national banks to establish outside branches if such branches could be established by state banks under state law. It is well to note that the same Act also removed the restriction on outside branch banking by state member banks previously imposed by the McFadden Act.

3. *The Policy of Competitive Equality.*

It appears clear from this résumé of the legislative history of § 36 (c)(1) and (2) that Congress intended to place national and state banks on a basis of "competitive equality" insofar as branch banking was concerned. Both sponsors of the applicable banking Acts, Representative McFadden and Senator Glass, so characterized the legislation. It is not for us to so construe the Acts as to frustrate this clear-cut purpose so forcefully expressed by both friend and foe of the legislation at the time of its adoption. To us it appears beyond question that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864. See *Lewis* v. *Fidelity & Deposit Co.,* 292 U. S. 559, 565–566 (1934); *McClellan* v. *Chipman,* 164 U. S. 347 (1896); *Chase Securities Corp.* v. *Husband,* 302 U. S. 660 (1938); *Anderson Nat. Bank* v. *Luckett,* 321 U. S. 233 (1944).

The Comptroller argues that Utah's statute "expressly authorizes" state banks to have branches in their home municipalities. He maintains that the restriction, in the subsequent paragraph of the statute limiting branching solely to the taking over of an existing bank, is not applicable to national banks. It is a strange argument that permits one to pick and choose what portion of the law binds him. Indeed, it would fly in the face of the legislative history not to hold that national branch banking is limited to those States the laws of which permit it, and even there "only to the extent that the State laws permit branch banking." Utah clearly permits it "only to the extent" that the proposed branch takes over an existing bank.

The Comptroller also contends that the Act supersedes state law only as to "whether" and "where" branches may be located and not the "method" by which this is effected.

We believe that where a State allows branching only by taking over an existing bank, it expresses as much "whether" and "where" a branch may be located as does a prohibition or a limitation to the home office municipality.  As to the restriction being a "method," we have concluded that since it is part and parcel of Utah's policy, it was absorbed by the provisions of §§ 36 (c)(1) and (2), regardless of the tag placed upon it.

*Affirmed.*