## FIRST CITIZENS BANK AND TRUST COMPANY, Plaintiff,

v.

## SOUTHERN NATIONAL BANK OF NORTH CAROLINA, and William B. Camp, Comptroller of the Currency of the United States, Defendants.

### Civ. No. 968.

United States District Court,
E. D. North Carolina,
Fayetteville Division.

June 30, 1971.

George R. Ragsdale, Smith, Anderson, Dorsett, Blount & Ragsdale, Raleigh, N. C., for plaintiff.

Dickson McLean, Jr., McLean, Stacy, Henry & McLean, Lumberton, N. C., and Joseph B. Chambliss, Chambliss, Paderick & Warrick Clinton, N. C., for defendant Southern Nat. Bank of North Carolina.

John E. Shockey, Legal Dept. Comptroller of Currency, Washington, D. C., and John R. Whitty, Asst. U. S. Atty., Raleigh, N. C., for defendant Camp.

## MEMORANDUM OF DECISION

DUPREE, District Judge.

By this action, First-Citizens Bank and Trust Company (First-Citizens) seeks a judgment declaring a certificate issued by the defendant William B. Camp, Comptroller of the Currency of the United States (the Comptroller), evidencing his approval and authorization for the establishment and operation by the defendant, Southern National Bank of North Carolina (Southern National), of a branch bank in the Town of Clinton, North Carolina, illegal and void and an injunction against Southern National enjoining the operation of the branch bank by Southern National pursuant to the certificate. The case is before the court on cross-motions of the plaintiff and defendants for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

In its complaint First-Citizens alleges that the Comptroller's approval of the branch was void for failure of the Comptroller to make express findings of "need and convenience" and "solvency of the branch" as required by the provi-

sions of the North Carolina statutes relating to the establishment of branch banks, G.S. § 53–62(b). It is also alleged that "no substantial evidence as to need and convenience and solvency has been presented to the Comptroller which would justify his issuing his certificate authorizing the establishment of the proposed branch".

By their answers the defendants have denied the material allegations of plaintiff's complaint and have alleged that the defendant Comptroller did in fact take into account all appropriate factors in his review and approval of the contested branch application; that his decision was not arbitrary, capricious or irrational; that he has made the necessary findings of fact to comply with North Carolina law; and that his findings are fully supported by substantial evidence in his voluminous administrative record, a copy of which has been filed in this action in support of the defendants' motions for summary judgment.

On November 5, 1969, Southern National filed its application with the Comptroller for permission to establish a branch bank in Clinton, North Carolina. The application was supported by financial and economic data, and a field examination was conducted by a national bank examiner. First-Citizens, one of only two banks in Sampson County where Clinton is located, protested the application and requested a hearing. The other bank in the county, First Union National Bank, filed no objection.

The requested hearing was held in Richmond, Virginia, on March 26, 1970, at which time Southern National and First-Citizens presented evidence on the merits of the application. Ten witnesses testified for Southern National and two for First-Citizens. Numerous documentary materials were received from both parties, and a verbatim transcript

was made. After Southern National's application was filed but before the hearing in Richmond on March 26, 1971, Cape Fear Bank and Trust Company, a small state-chartered bank with its principal office in Fayetteville, North Carolina, applied for and was granted authorization to establish a branch bank in Clinton by the North Carolina Banking Commission.[1]

Thereafter various members of the Comptroller's staff including the national bank examiner, the regional administrator and the regional economist, reviewed the "statistical and qualitative evidence" and unanimously recommended to the Comptroller that Southern National's application be approved. In an opinion dated February 22, 1971, the Comptroller did approve the application, and on April 16, 1971, he issued a formal certificate authorizing the establishment and operation by Southern National of a branch in Clinton. The branch bank was opened by Southern National on April 20, 1971, the same day this action was instituted.

The authority of the Comptroller to authorize the opening of branch banks by national banking associations is contained in 12 U.S.C. § 36(c) which reads in pertinent part as follows:

"A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) * * *; and (2) at any point within the state in which said association is situated, if such establishment and operation are at the. time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * * "

---

1. For some reason not readily apparent this seemingly significant development received scant attention by the parties at the hearing in Richmond, and has virtually been ignored by the Comptroller in his subsequent opinions, pleadings and briefs.

█ Thus it is necessary to look to the provisions of the North Carolina statute governing the establishment of branch banks in order to ascertain the conditions under which branch banks may be established in this state. This statute is found in North Carolina General Statutes § 53–62(b) which reads as follows:

"Any bank doing business under this chapter may establish branches or teller's windows in the cities or towns in which they are located, or elsewhere, after having first obtained the written approval of the Commissioner of Banks, which approval may be given or withheld by the Commissioner of Banks, in his discretion. The Commissioner of Banks, in exercising such discretion, shall take into account, but not by way of limitation, such factors as the financial history and condition of the applicant bank, the adequacy of its capital structure, its future earnings prospects, and the general character of its management. Such approval shall not be given until he shall find (i) that the establishment of such branch or teller's window will meet the needs and promote the convenience of the community to be served by the bank, and (ii) that the probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of said branch or teller's window and of the existing bank or banks in said community."

Notwithstanding the clear mandate of these statutes and the equally clear construction which they have received by the courts, First National Bank of Logan, Utah v. Walker Bank & Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L. Ed.2d 343 (1966), and First-Citizens Bank & Trust Company v. Camp, 409 F. 2d 1086 (4th Cir. 1969), the Comptroller indicated in his opinion of February 22, 1971, that he was not bound by these statutes, that he would consider factors other than those mentioned in the North Carolina statute and that he would not make the findings required by the North Carolina statute.[2]

Faced with this expressed determination to flout the law,[3] this court had no

---

2. "The protestant has shown that it and First Union—who together dominate the banking market in Sampson County—provide excellent service to the community's banking public. Protestant also argues that growth of the Clinton-Sampson County economy is slow and that the applicant can demonstrate only a minimal amount of existing business in the area. These arguments are emphasized by reference to Section 53–62(b) of the North Carolina General Statutes, which require the State Commissioner of Banks, before approving a branch application, to find that the branch ' * * * will meet the needs and promote the convenience of the community * * * ' and that ' * * * the probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of said branch * * * .' First-Citizens contends that these criteria have not been met, and the Southern National's branch application therefore should be denied. The Comptroller chooses, however, to look to factors other than those emphasized by First-Citizens.

\* \* \* \* \*

"The Comptroller therefore declines here, an in three other opinions issued today approving branches in North Carolina, to make the findings required of the State Banking Commissioner by Section 53–62(b) of the North Carolina General Statutes. For the reasons stated herein, the Comptroller approves the application of the Southern National * * * to establish a branch at * * * Clinton, North Carolina."

3. This is not the first time the Comptroller has been judicially taken to task for his inexplicable reluctance to acknowledge his subjection to the law. In the unreported decision of Central Bank & Trust Company v. Camp, No. C–4–D–66, Chief Judge Edwin M. Stanley of the Middle District of North Carolina had this to say: "Unfortunately, the written opinion entered by the Comptroller on October 2, 1967, lacks much to be desired. This apparently results from the fact that the Comptroller, for some unsatisfactorily explained reason, still insists, and spends a good portion of his brief arguing, that he is only bound by 'capital' and 'location requirements' of state law in considering applications by national banks to estab-

hesitance in issuing a preliminary injunction on plaintiff's motion enjoining the continued operation by Southern National of the branch in Clinton.[4] Solid authority for this ruling was readily available in the memorandum opinion by Chief Judge Edwin M. Stanley of the Middle District of North Carolina in the case of First National Bank of Catawba County v. Wachovia Bank & Trust Company, 325 F.Supp. 523, filed April 15, 1971. In that case the Comptroller had issued an opinion employing virtually the same language as that used in his opinion in the instant case,[5] but the certificate of authority had not been issued by the Comptroller and the branch bank had not been opened. In granting the permanent injunction sought in that suit Judge Stanley said:

"Throughout his opinion, the Comptroller argues at great length as to why the pronouncements of the United States Supreme Court in the *Walker Bank* case (385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343) and the holdings of the district court and the Court of Appeals in the *First Citizens Bank* case (409 F.2d 1086) are unsound law and attempts to rationalize his reasons for ignoring these decisions. He specifically states that it is unclear as to whether the competitive factors present were sufficient to 'satisfy the North Carolina "needs and convenience" test when, as contended by the protestants, the community already re-

ceives fine service from existing banks'. He ends his opinion by stating that he declines to make findings with respect to 'needs and convenience' criteria 'as required of the State Banking Commissioner by Section 53–62(b) of the North Carolina General Statutes'. Having arbitrarily and capriciously elected to ignore clearly defined principles of law, it follows that the opinion of the Comptroller approving the application of Wachovia is a nullity and that he should be permanently enjoined from issuing a certificate to Wachovia authorizing the establishment of a branch bank in Hickory, North Carolina."

Despite the infelicity of some of the Comptroller's language, a careful reading of his entire opinion in this case left this court with the impression that he had in fact taken into account the factors required to be considered by the North Carolina statute and that his findings may very well have sufficed to satisfy the requirements of that law notwithstanding his avowed intention not to do so. Accordingly, leave was granted the Comptroller to file a supplemental opinion clarifying his original decision.

Shortly thereafter the Comptroller filed his answer herein and alleged among other things:

" * * * The defendant Comptroller alleges that his review and approval of the application of Southern Nation-

lish branches. He makes this argument in face of the recent decision of the Supreme Court in First National Bank [of Logan, Utah] v. Walker Bank [& Trust Company], 385 U.S. 252, [87 S.Ct. 492] (1966), which specifically holds that 'national branch banking is limited to those states the laws of which permit it, and even there only to the extent that the state laws permit branch banking' and that the Comptroller is not permitted to 'pick and choose what portion of the law binds him' * * *. Without belaboring the point further, it is sufficient to say that the argument of the Comptroller is rejected for the reason that this court, and indeed all courts, are bound by the pronouncements of the United States Supreme

Court, and no case or statute has been cited or found which puts the Comptroller in a different category."

4. The injunction was to have become effective on May 18, 1971, but on motion of the defendants following the filing of their answers and the issuance by the Comptroller of a supplemental opinion, the effective date of the injunction was stayed pending the outcome of the hearing on the cross-motions for summary judgment which was scheduled and held on May 28, 1971.

5. This was one of the "three other opinions issued today" referred to by the Comptroller in his opinion in this case. See Footnote 2.

al Bank of North Carolina for a branch in Clinton in fact took into account, and did satisfy, all requirements under North Carolina General Statute § 53–62(b) in connection with state bank branch applications in North Carolina."

This was followed by a "supplemental opinion" dated May 21, 1971, the pertinent portions of which are set forth in the margin.[6]

While evidencing a continuing disdain for the use of the statutory language, this second opinion does suffice, in the

6. "The Comptroller's investigation of the Clinton application of Southern National took into account numerous factors routinely inquired into by the Comptroller's Office in connection wtih all national bank branch applications. Thus the Comptroller's consideration, pursuant to the published guidelines of the Office, involved development of all the pertinent economic factors, such as the composition of population, economic growth, and banking needs of the community; and included inquiry as to whether existing banks are providing a full complement of services and convenient facilities and as to whether the services offered were available at competitive rates. Of particular interest in the context of the Clinton banking market were the nature of the services offered by the existing banks and the prospects of the applicant being able to make a signficant contribution to the meeting of present community needs and the fostering of community development.

"Upon further consideration, the Comptroller reaffirms his previous approval of the application of Southern National for a branch in Clinton, North Carolina. The Comptroller finds:

"First, approval of this application will satisfy present and potential banking needs of the Clinton-Sampson County community and contribute to further community growth and development. Although applicant's existing business in the community at the time of the application was small—consisting then of some 87 deposit accounts totaling $45,000, 42 loan accounts totaling $15,000 and 57 Master Charge retail credit accounts totaling $11,000—it was not insignificant. Applicant unquestionably will be able to serve the major part of these customers more efficiently from a convenient office location in Clinton. Indeed, the fact that this existing businss has accrued to Southern National despite substantial present inconvenience is both strong testimony to the customer loyalty which this bank can command and, to some extent, indicative of public demand for its services in Clinton. Additionally, the Comptroller is persuaded that applicant's peculiar expertise in farm management, including

experience in crop diversification and marketing development will bring to the Clinton public and alternative banking source with a needed different orientation and with services of special benefit to this predominantly agricultural community. No sound reason appears why this agricultural community should be compelled to look outside the area for the services which Southern National can provide, and desires to bring, to the Clinton-Sampson County area through a more convenient facility in Clinton. The Comptroller is satisfied that the competition which Southern National would offer would be both immediately beneficial to the community and a positive and desirable stimulant to the area's economic growth. Second, the present and potential requirements for banking services in the Clinton area are sufficiently strong to allow profitable entry and operation of a Southern National office without damage to the stability of existing banks. During the six-year period 1962–1968 the total number of bank accounts for Sampson County grew from 16,000 to 26,000 and total deposits grew from $17.6 million to $36 million. From 1966 to 1968 alone, total deposits grew from $27.7 million to $36 million, or almost 30 per cent. In view of this impressive growth, applicant's projections of $1 million in deposits for this office within one year of opening and profitable operations within three years appear not unreasonable. The domination of the Clinton market by protestant First Citizens and First Union is not likely to be altered signficantly in the near term by the entry of applicant and in the long term the additional vigorous competition which will thereby be prompted will, in the opinion of the Comptroller, insure increased profits for all banks in the community while contributing to the area's economic growth.

"For all these reasons and those stated in the Comptroller's original opinion, therefore, the application of Southern National Bank of North Carolina, Lumberton, North Carolina, for a branch in Clinton, North Carolina, has been approved."

court's view, to lend validity to the initial suspicion that the Comptroller had in fact complied, albeit grudgingly, with the law.

The court's task thus becomes one of examining the bulky administrative record amassed by the Comptroller to see if his findings and conclusions meet the requirements of the substantial evidence test applicable in such cases.[7] First-Citizens Bank & Trust Company v. Camp, 409 F.2d 1086 (4th Cir. 1969). If so, the defendants are entitled to summary judgment; otherwise, the plaintiff is entitled to the relief sought.

The main thrust of plaintiff's argument is that the Comptroller's conclusions are clearly erroneous and manifestly against the weight of the evidence. Were this court sitting as the fact finder, admittedly plaintiff's argument would be highly persuasive.[8] But the court is not called upon—indeed is without authority—to decide the ultimate question of whether or not Southern National should be permitted to es-tablish a branch in Clinton. This is solely the province of the Comptroller, and it is well settled that the court cannot substitute its judgment for that of an administrative agency charged by law with the duty of making such determinations where the findings and conclusions of the agency are supported by substantial evidence.

The substantial evidence rule is a familiar principle of administrative law. Briefly stated, the principle is that the findings and decisions of an administrative agency will not be overturned by a reviewing court if the findings are supported by substantial evidence in the administrative record. The term "substantial evidence" has been defined by the Supreme Court in Consolidated Edison Company v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), as follows:

> "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

7. The plaintiff advances the ingenious argument that having concluded his opinion with the words, "For the reasons stated herein the Comptroller approves the application * * *", we need look only to the "reasons stated"; that these do not suffice to show the needs and convenience criteria of the North Carolina statute have been met but in fact show the contrary (e. g., the finding that First-Citizens and the other existing bank "provide excellent service to the community's banking public") ; and that the Comptroller did not make the required findings for the simple reason that he could not in all honesty do so. The court cannot place such a restricted construction on the Comptroller's opinions, particularly in view of the fact that he was not required by any statute or regulation brought to the court's attention to file any written opinion at all. Nor does the court agree that the reasons stated by the Comptroller, however abstruse his language may have been, were without legal substance.

8. It seems to the court that many of the Comptroller's findings would have supported denial of the application. For example, the adequacy of existing banking facilities; the intervening approval of Cape Fear Bank & Trust Company's branch by the State Banking Commissioner, thus supplying the much needed (according to the Comptroller) "aggressive banking competition" and at the same time further diluting an already well saturated banking market; the virtually static population growth of the area; the comparatively low per capita income of the people of Sampson County; the minimal number of pre-existing Southern National customers to be served by the new facility; the probability that the amount to be invested in new quarters for the branch will result in an investment in excess of Southern National's capital (a finding of the national bank examiner) ; the conjectural nature of the recommendations of the regional consultant economist ("this analyst believes that the public interest will probably be served by granting the approval which the subject application requests") ; and the finding by the national bank examiner that "except for farm product diversification, which has aided in maintaining a moderately healthy agricultural economy, the economic outlook and prospects for Sampson County are not particularly impressive".

In support of that definition the Supreme Court cited the decision of Judge Parker in the case of Appalachian Electric Power Company v. N. L. R. B., 93 F.2d 985 (4th Cir. 1938), where it was said at page 989:

> "The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict.
>
> In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences."

■ Viewed in the light of these standards the court has reached the conclusion that the decision of the Comptroller in this case, as clarified by his answer and supplemental opinion, meets the test of the substantial evidence rule and must be upheld. It would serve no useful purpose to recapitulate the evidence in its entirety, but suffice it to say that the court, having carefully reviewed the 545-page administrative record of the Comptroller with exhibits, the 15 pages of his two opinions, the 245-page transcript of the hearing in this court and some 200 pages of briefs and affidavits filed herein, finds that while there was cogent evidence to the contrary, there was also substantial factual support for the Comptroller's decision. Some of the evidence which the court found impressive is set forth in the margin.[9]

Having reached this conclusion, consideration of an additional defense of the defendants based on laches becomes unnecessary.

Finally, the court is constrained to comment on what has apparently become an obsession with the Comptroller, that is, the notion expressed in his original opinion in this case (and in three others issued the same day) that he is not bound by those provisions of the North Carolina statute relating to "needs and convenience" and "solvency" in approv-

---

9. First of all, the record of Southern National as a competently-managed, aggressive banking institution is attested by its almost phenomenal growth in the last ten years (from $12 million to $165 million in resources). That the economic outlook in Sampson County is not all bad is evidenced by the fact that total bank deposits in that county more than doubled in the six years between 1962 and 1968, a rate of growth exceeding that for North Carolina as a whole; the fact that total farm income for the county increased by about 80 per cent in the 11-year period from 1958 to 1969; and that retail sales in the county more than doubled during this same period. There was evidence that the continuing increase in farm income was almost unique among counties in eastern North Carolina and that this reflected diversification in agriculture and a shift to the production of livestock. It was shown that Southern National is particularly well suited to assist in diversification and promotion of agriculture in Sampson County through its farm management program which offers experienced management knowhow in improving farm efficiency, and Southern National also has an industrial promotion department which emphasizes industrial development in the communities which it serves by locating industrial prospects, financing new industries, locating and acquiring plant sites and supplying various other needs of new industries. These farm management and industrial promotion services are not presently duplicated by the other banks serving Sampson County. In addition to the statistical evidence, Southern National offered the testimony of a representative group of business leaders and public officials in the community who testified as to the need and desirability for an additional banking facility offering the services stressed by Southern National.

This was some of the evidence tending to support the finding that the "needs and convenience" criteria prescribed by the North Carolina statute had been met, and it also tends to support the Comptroller's findings that the "solvency of the branch and existing banks" requirement had been satisfied. With the exception of the Cape Fear Bank & Trust Company, all the banks concerned are statewide organizations, and the question of solvency is not one of real concern here.

ing applications by national banking associations to establish branch banks in this state. He says in that opinion (pp. 6–7):

"If, as the Fourth Circuit more recently concluded, the Comptroller is 'bound' in approving branches by state statutes concerning economic factors, a state could just as easily preclude the Comptroller from considering a community's need and convenience. Such an untenable result is not at all hypothetical. * * * Thus the issue is not whether the North Carolina statute is broad enough to cover the factors usually considered by the Comptroller, but whether any state has been given the power to limit the Comptroller's ability to consider economic and similar criteria in approving or disapproving branches. There are a number of reasons why this power has been denied to the states."

In view of the fact that the federal statute [12 U.S.C. § 36(c)] does not make mandatory the issuance of a certificate by the Comptroller even if the requirements of state law have been met, this statement is simply a non sequitur. The Comptroller himself says later in his opinion (p. 8) that with certain exceptions he is free to exercise his discretion in these matters.

When he flatly asserts, however, that he will not follow the clear mandate of the federal banking law as interpreted by the Supreme Court of the United States and the Court of Appeals for this Circuit (see Footnote 2) he leaves the courts no choice (absent a retraction as he made in this case) except to overturn his decisions.

The result is that the court has the better part of three weeks, counsel have countless hours of work and the litigants untold expenses invested in a case which might well have been avoided if the

Comptroller had simply stated in his original opinion that he had found the requirements of the North Carolina law with respect to "needs and convenience" and "solvency" to have been satisfied.[10] It is hoped that his choice of language in future cases may be more felicitous.

Judgment will be entered in accordance with this decision dissolving the injunction previously entered and sustaining the motions of defendants for summary judgment.

---

10. Not entirely blameless in this matter is the plaintiff, First-Citizens, whose then counsel (who has at no time been involved in this litigation), according to affidavits filed herein, solemnly, though in perfect good faith, assured the Comp-

troller in a conference in his office in Washington on March 15, 1971, prior to the issuance of the certificate here in question, that this action would not be instituted.