**INDEPENDENT BANKERS ASSOCIATION OF NEW YORK STATE, INC. and The Canandaigua National Bank and Trust Company, Plaintiffs,**

*v.*

**MARINE MIDLAND BANK, N.A. and Wegman's Food Markets, Inc., Defendants.**

**No. CIV-83-1006T.**

United States District Court,
W.D. New York.

April 6, 1984.

---

Greisberger, Zicari, McConville, Cooman & Morin, P.C., Rochester, N.Y., for plaintiffs; Kevin S. Cooman, Rochester, N.Y., of counsel.

Phillips, Lytle, Hitchock, Blaine & Huber, Buffalo, N.Y., for defendant Marine Midland; Paul Stecker, Buffalo, N.Y., of counsel.

Nixon, Hargrave, Devans & Doyle, and Paul S. Speranza, Jr., Rochester, N.Y., for defendant Wegman's Food Markets, Inc.; Michael R. Wolford, Rochester, N.Y., of counsel.

## MEMORANDUM DECISION and ORDER

TELESCA, District Judge.

This Court is faced with the dilemma of interpreting the legislative intent of a 1927

federal banking statute in an effort to determine if the "computer banking" at issue in this case would have been considered "branch banking" by the Congress when it passed the McFadden Act more than 50 years ago. As a part of this endeavor, separate State and Federal statutory schemes must be blended together with the hopeful and improbable result that such joint construction will lead to "competitive equality" between banking institutions of both sovereigns. Recognizing from the outset that a perfect solution may not be within the power of the judiciary and may better be left to the legislative branch, and based upon the reasons set forth below, I hold that defendant Marine Midland Bank's activities violate the McFadden Act and must be enjoined.

### PROCEDURAL BACKGROUND

Plaintiffs, the Independent Bankers Association of New York State, Inc. (IBA-NYS), a non-profit corporation consisting of some 96 member banking institutions, and the Canandaigua National Bank and Trust Company, a federally chartered banking association and a member of IBA-NYS with its home office located in the City of Canandaigua, have brought this action seeking declaratory and injunctive relief against Marine Midland Bank, N.A. (Marine) a federally chartered banking association and Wegman's Food Markets, Inc. (Wegman's), a supermarket chain with numerous outlets including one located in the City of Canandaigua, New York. The complaint alleges that the automated teller machine (ATM) located at the Wegman's Canandaigua store and its utilization by Marine constitutes branch banking in violation of the McFadden Act, 12 U.S.C. Section 36(c) and illegal banking by Wegman's, in violation of New York Banking Law Section 131.1.

In lieu of answering the complaint, Wegman's moved to dismiss the pendant state claim alleged against it on the ground that subject matter jurisdiction was lacking.

This Court denied Wegman's motion and held that a District Court does, under proper circumstances, possess so-called "pendant party" jurisdiction under Article III of the Constitution, and that the facts alleged in the complaint provided a sufficient context to exercise such jurisdiction. *Independent Bankers Association of New York State, et al. v. Marine Midland Bank, et al.,* 575 F.Supp. 1425 (W.D.N.Y. 1983).

Plaintiffs now move for summary judgment on both the federal and state claims, and Marine has cross-moved for summary judgment.

### FACTS

All parties concede that the relevant facts are not in dispute. In the summer of 1983 Wegman's installed an ATM in its Canandaigua, New York supermarket.[1] Shortly thereafter, Wegman's entered into a contract with Marine to tie the Canandaigua Wegman's ATM into the HarMoney computer network. Customers of a HarMoney member financial institution (of which Marine is one) may, by placing an identification card issued by a member bank into the ATM, make contact with their bank for the purpose of making deposits, withdrawals, balance inquiries or obtaining a cash advance on a credit card account.

Under this arrangement, Wegman's retains ownership of the ATM and is responsible for loading the machine with cash, and issuing the receipts. Wegman's has no access to the secured container in which deposits are automatically placed and is not responsible for any discrepancies between the amount displayed on the transaction slip and the amount actually deposited. Marine itself is responsible for emptying the deposit container each day. When a customer uses the ATM for a withdrawal, (or a cash advance from a credit card account) the ATM dispenses cash provided by Wegman's, but only after electronic approval has been received (through the com-

---

1. Canandaigua is a small city located at the northern end of a Finger Lake by the same name, and has a population of approximately 11,000.

puter network) from Marine. Accordingly, the ATM and its owner Wegman's will not dispense funds to a customer in excess of the amount in his Marine bank account.

Once the transaction is approved by Marine (which occurs while the customer waits), the customer's account is debited and Wegman's account is credited in the identical amount. Wegman's account is also credited at that time with a transaction fee paid by Marine for each transaction made by one of its customers through the Wegman's ATM.

It is against this factual background that the statutory framework must be imposed.

## DISCUSSION

### THE CLAIM AGAINST MARINE

#### I.

In the early 1920's this country experienced increasing tension between banks chartered by the federal government and those chartered by the states. Much of this tension was caused by the proliferation of bank branching at that time by state banking institutions. The concern was that state banks were being granted a competitive advantage under state banking laws to the detriment of the federal banks. In response to this concern, the McFadden Act, 12 U.S.C. Section 36, was enacted. In the words of its sponsor, Representative McFadden:

As a result of the passage of this act, the National Bank Act has been so amended that national banks are able to meet the needs of modern industry and commerce and competitive equality has been established among all member banks of the Federal Reserve System.

68 Cong.Rec. 5815 (1927).

In *First National Bank of Logan v. Walker Bank and Trust Co.*, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) (*"Walker Bank"*) the Supreme Court exhaustively explored the legislative history of the McFadden Act and concluded: "It appears clear from this resume of the legislative history of Section 36(c)(1) and (2) that Con-

gress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned". *Id.* at 261, 87 S.Ct. at 497. The Act supports this policy by "permit[ting] national banks to establish branches if such branches could be established under state law". *Id.*

The definition of a "branch" under the McFadden Act is provided in Section 36(f):

The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any state or territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

Although this statutory definition was enacted in 1927, it was not until 1969 that the Supreme Court determined in *First National Bank of Plant City, Florida v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (*"Plant City"*) that federal law controlled its interpretation. *Id.* at 134, 90 S.Ct. at 343.

At issue in *Plant City*, was a bank which utilized an armored car with a customer window installed on one side to provide services to customers in stated locations at stated times. The armored car would roll up to a place of business where employees could then make deposits and withdrawals from their bank accounts, although by prearranged agreement, the deposits and withdrawals would not be considered effective until the transactions were actually processed back at the bank's main facility. In response to the bank's argument that the armored car did not constitute a branch within section 36(f) the Court held:

The definition of "branch" in Section 36(f) must not be given a restrictive meaning which [would] frustrate the congressional intent "of advancing competitive equality" this Court found to be plain in *Walker Bank, supra.* ... However, the term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending

money apart from the chartered premises; it may include more.

*Plant City, supra,* 396 U.S. at 134–135, 90 S.Ct. at 343–344.

The Court went on to conclude:

Because the purpose of the statute is to maintain competitive equality, it is relevant in construing "branch" to consider, not merely the contractual rights and liabilities created by the transaction, but all those aspects of the transaction that might give the bank an advantage in its competition for customers. Unquestionably, a competitive advantage accrues to a bank that provides the service of receiving money for deposit at a place away from its main office; the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of receipt or somewhat later. *Id.* at 136–137, 90 S.Ct. at 345.

The influx of computer terminals into the banking field in the early 1970's prompted the Comptroller of the currency to issue regulations purportedly exempting these terminals from the definition of "branch banking" in the McFadden Act. See 12 CFR Section 7.7491 (1975). In *Independent Bankers Association of America v. Smith,* 534 F.2d 921 (D.C.Cir.1976) ("*Smith*") the court held that customer bank communications terminals (CBCT's) owned by a national bank which accepted deposits and disbursed funds, fall within the definition of "branch banking" found in Section 36(f). Numerous other circuit courts have subsequently reached the same conclusion. *See State of Illinois v. Continental Illinois National Bank and Trust Company of Chicago,* 536 F.2d 176 (7th Cir.1976); *State of Colorado, ex rel. State Banking Board v. First National Bank of Fort Collins,* 540 F.2d 497 (10th Cir.1976), cert. denied, 429 U.S. 1091, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1976); *State of Missouri, ex rel. Kostman v. First National Bank in St. Louis,* 538 F.2d 219 (8th Cir.1976), cert. denied, 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976).

II.

Defendant Marine now seeks to carve an exception out of the holding of *Smith* and the other circuit court decisions, by arguing that Wegman's *ownership of the ATM* at issue distinguishes this case from *Smith* and its progeny. In support of this position, Marine points to the latest regulation of the Comptroller now excluding CBCT's *which are not owned or rented* by a national bank, from the definition of "branch" found in Section 36(f). 12 C.F.R. Section 5.31(b). Marine argues that due deference should be given to the expertise of the Comptroller in this area and his expert opinion should not be rejected unless it is clearly arbitrary and capricious.

Marine also argues that this position is supported by Section 36(c) of the Act itself which limits the Act's application to branches "established and operated" by a bank and further, by a phrase in the *Smith* decision which stated that "any facility that performs the traditional bank functions of receiving or disbursing funds is a 'branch' of a national bank within the meaning of Section 36(f) if (1) the facility is established (*i.e., owned or rented*) by the national bank, *and* (2) it offers the bank's customers a convenience that gives the bank a competitive advantage over other banks ...". *Smith, supra,* 534 F.2d at 951 (emphasis added). Marine contends that this phrase implies that a CBCT *not owned or rented* by a national bank, such as the Wegman's ATM, is *not a branch* within the definition of Section 36(f).

Finally, Marine argues that the competitive equality intended to be fostered by the McFadden Act would be disrupted by a ruling that Marine cannot utilize the Wegman's ATM machine because state banks would continue to do so, at least to a limited extent, thereby placing Marine at a decided competitive disadvantage. These arguments will be dealt with seriatim.

A.

■ Initially, Marine's argument that this Court should defer to the expertise of the Comptroller of the currency in his con-

struction of Section 36(f) is somewhat less than compelling. If the Supreme Court had acceded to this view, both *Plant City* and *Walker Bank* would have yielded different results, for in both cases the Comptroller's construction of this very section was expressly rejected. More recently, when the Comptroller was of the opinion that all CBCT's were not branches, the District of Columbia Circuit Court of Appeals again rejected the Comptroller's construction of the statute. *See Smith, supra.* Now, after the Comptroller has retreated to his present position (i.e., that a CBCT is not a branch, if it is not owned or rented by a national bank), Marine argues that this Court should blindly accept that view. I disagree. Where an agency has not taken a long-standing and consistent position in interpreting a statute it is empowered to apply, (which is clearly the case here), this Court need not, and should not give substantial weight to its most recent interpretation. Cf. *United States of America v. University Hospital of New York at Stony Brook (Baby Jane Doe)*, 729 F.2d 144, at 154 (2nd Cir.1984); *Frank Diehl Farms v. Secretary of Labor*, 696 F.2d 1325, 1329–1331 (11th Cir.1983).

### B.

■ Marine's second argument that the holding in *Smith* is inapplicable to the present situation because here it is Wegman's that owns the machine rather than the Bank, presents the proverbial distinction without a difference. Marine's customers using the Wegman's ATM can withdraw or deposit money in their Marine Midland bank account, or receive a cash advance (i.e. a loan) from a Marine Midland credit card account with the same force and effect as if they appeared personally at a Marine Midland "brick and mortar" branch and made the same transactions. Weg-

man's, its ATM and the HarMoney system only provide a vehicle for the bank and its customers to do business. The argument that Wegman's and the HarMoney network should somehow insulate Marine's activities through the Wegman's ATM and place it outside of the definition of "branch banking" in Section 36(f) is substantially similar to the bank's argument in *Plant City*. There the bank attempted (by contract) to make deposits and withdrawals accomplished at the armored car facility valid only after being processed at the main bank branch. This "form over substance" argument was expressly rejected by the Supreme Court.

More importantly, the Supreme Court in *Plant City* specifically held that the definition of "branch" found in Section 36(f) had a "calculated indefiniteness" and that the definition must be read broadly to promote the overall policy behind the Act. "Penetrating the form ... to the underlying substance of the transactions", this Court is satisfied, as was the Supreme Court in *Plant City*, that when a customer deposits money in a Marine Midland account through the Wegman's ATM, that "the bank has, for all purposes contemplated by Congress in Section 36(f), received a deposit". *Plant City, supra*, 396 U.S. at 137, 90 S.Ct. at 345. This is sufficient to constitute "branch banking" within the meaning of Section 36(f).

■ Moreover, it is undeniable that the utilization of Wegman's ATM in Canandaigua grants a competitive advantage to Marine by allowing the bank to provide the service to customers of depositing money at a place away from the bank's main office. *See Plant City, supra*, 396 U.S. at 138, 90 S.Ct. at 345. As the ultimate purpose of the McFadden Act was to prevent just such advantages, Marine's owned or rented limitation must fail.[2]

---

**2.** Notwithstanding the above analysis, and for the moment assuming that Marine's (and the Comptroller's) interpretation of the *Smith* decision is correct, Marine's argument remains flawed. It is uncontroverted that Marine pays a fee per transaction for the use of the Wegman's ATM machine. Even under the Comptroller's strained interpretation of the statute, (that a computer terminal must be owned or rented by a bank before such terminal will be considered a "branch") it is without question that Marine does pay "rent" of sorts. Thus, under any interpretation of the Act, Wegman's ATM does con-

### C.

Marine's final argument in support of its position that the Wegman's ATM is not a branch, is that any holding to the contrary would actually disrupt the competitive equality intended to be fostered by the Act. In support of its position Marine submits an opinion of the New York State Banking Department which indicates that a state bank may utilize an ATM and allow customers to make withdrawals from bank accounts and credit card accounts, as well as balance inquiries without running afoul of New York's branch banking restrictions. Because a facility which permits a customer to make a withdrawal from a bank account must be considered a branch under the analysis set forth in *Plant City*, the federal bank may in fact be prohibited from fairly competing with a state bank whose customers can utilize an ATM to make withdrawals. Assuming arguendo that this opinion construing state law is correct, an assumption vigorously rebutted by plaintiffs,[3] it is this Court's view that Congress, and not the judiciary, must provide the remedy.

■ As the Court noted in *Smith*, the limited incorporation of state law into the McFadden Act was not "designed to insure perfect equality between the branches of state and national banks". 534 F.2d at 949. The *Smith* court went on to hold that even if a state were to exclude CBCT's from its own definition of a "branch", the McFadden Act would still prohibit the utilization of a CBCT by a federal bank where state "branching" was not permitted. *Id.* at 948.[4]

■ Put simply, courts are constrained to read statutes as they are written, and not as with hindsight we would like them to have been written. If New York's "branch banking" definition is indeed more narrow than that provided in Section 36(f) of the McFadden Act, and this places federal banks at a competitive disadvantage in New York, relief can only be granted through the legislative process.

In summary, I hold that Marine's utilization of the Wegman's ATM to allow customers to make deposits and withdrawals from Marine Midland bank accounts constitutes a "branch" within the meaning of 12 U.S.C. Section 36(f).

### III.

■ The next step in regard to plaintiffs' claim against Marine is to determine whether state law prohibits bank branching in Canandaigua. New York Banking Law Section 105, the applicable statute, prohibits branching of state banks in a city with a population of 50,000 or less in which the principal office of another bank, trust company or national banking association is already located. Defendants freely admit that plaintiff Canandaigua National Bank has its principal place of business in Canandaigua, and that the City of Canandaigua has a population of less than 50,000. Thus, the unavoidable conclusion is that state law prohibits branching in the City of Canandaigua and therefore, 12 U.S.C. Section

---

stitute a "branch" of Marine within the meaning of 12 U.S.C. Section 36(f).

**3.** Plaintiffs argue that New York Banking Law Section 105–a.3 allows the utilization of an ATM by an outside bank in a protected area like Canandaigua *only* to "verify or guarantee checks ... or to verify account balances". As neither of these functions would fall within the definition of "branch banking" in the McFadden Act, plaintiffs argue that Marine could utilize the ATM to the same extent any state bank could. Plaintiffs contend that the New York Banking Department opinion is incorrect and of no force or effect.

**4.** Plaintiffs contend in their reply brief that such a situation need not place national banks at a disadvantage citing *State Bank of Fargo v. Merchants National Bank and Trust Company of Fargo, supra,* 593 F.2d at 345–346, in support of the proposition that under the McFadden Act, national banks may be permitted to utilize ATM's to the same extent state banks are permitted to use them under state law. However, this holding was unique to that case for North Dakota law defined "branch banking" by reference to the McFadden Act. New York Banking Law Section 105 does not have this feature, and thus, plaintiffs' "equality solution" is impermissible under the facts and law involved herein.

36(c) prohibits Marine's utilization of the Wegman's ATM machine in that City.

## THE CLAIM AGAINST WEGMAN'S

Plaintiffs' state law claim against Wegman's is a bit more tenuous. Plaintiffs assert that New York Banking Law Section 131.1 prohibits Wegman's from owning and operating its ATM in Canandaigua or elsewhere.[5] Plaintiffs are unable to present any New York caselaw which even remotely suggests that Wegman's activities constitute "banking" under Section 131.1. This alone could be construed as supporting the legality of Wegman's activities, and is accented by the fact (pointed out by Wegman's) that these machines have been in operation for over ten (10) years.

However, of more substantial importance is this Court's previous holding that Wegman's ATM merely provides the vehicle through which a bank in the Har-Money network can transact business with the customer. At most, Wegman's is acting as an agent for a bank, and not as a banking institution itself. Thus, the policy behind Section 131.1, to confine banking functions to government chartered, regulated and inspected institutions, *see New York Credit Men's Adjustment Bureau, Inc. v. Samuel Breiter and Co., Inc.*, 253 F.2d 675, 677 (2nd Cir.1958); *Miller v. Discount Factors, Inc.*, 1 N.Y.2d 275, 279, 152 N.Y.S.2d 273, 135 N.E.2d 33 (1956), is in no way abrogated by Wegman's ownership and maintenance of the ATM machine in the Canandaigua store, for it remains the chartered, regulated and inspected banks that are doing the banking—not Wegman's.

Finally, this Court is not willing to take the quantum leap necessary to reach the conclusion advanced by plaintiffs in this case. To do so, would be to place form of ownership over substance of the transaction, the precise argument advanced previously by Marine on the federal claim and soundly rejected. For instance, does Wegman's ownership of the ATM machine at issue place it in any different position than if it had simply leased space to Marine or another banking institution for the operation of the bank's own ATM? By a literal reading of the statute, even Wegman's leasing of space for banking purposes could be considered banking under Section 131.1, a result which is clearly unintended and unnecessary. In the present case it is true Wegman's has leased not only the floor space but also part of the computer hardware to the bank, but this does not materially change the crucial issue of which parties are actually involved in the banking process. Those parties are the same in either scenario; Marine and its customers.

With no New York authority to the contrary, I must conclude that the New York Legislature would not have intended ownership of the computer terminal to be the determining factor as to whether illegal banking was taking place. Accordingly, I hold that Wegman's activities are not in violation of Section 131.1 of the New York Banking Law, and the action is dismissed as against Wegman's.[6]

## CONCLUSION

As stated at the outset, an all encompassing solution to this issue of competitive equality among state and federal banking

---

**5.** New York Banking Law Section 131.1 provides in pertinent part: "No corporation, domestic or foreign, other than a national bank or federal reserve bank, unless expressly authorized by the laws of this state, shall employ any part of its property, or be in any way interested in any fund which shall be employed for the purpose of receiving deposits, making discounts, receiving for transmission or transmitting money in any manner whatsoever.... No corporation ... shall possess the power of receiving money for the transmission or of transmitting

the same, by draft, traveler's check, money order or otherwise."

**6.** Wegman's has not moved for summary judgment. However, this Court may under appropriate circumstances enter summary judgment in favor of the non-moving party. Cf. *Morrissey v. Curran*, 423 F.2d 393 (2nd Cir.1970), *cert. denied*, 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970); *Moss v. Ward*, 450 F.Supp. 591, 594 (W.D.N.Y.1978). The present circumstances, where no material facts appear to be in dispute, warrant such action.

institutions is probably unattainable under the present statutory scheme. The application of a 50 year old statutory definition to the type of technology which could never have been dreamed of at the time the legislation was enacted is fraught with inconsistencies which are not easily reconcilable. This is equally true with respect to Section 131.1 of the New York Banking Law which was also enacted before the technology utilized in the ATM machine was developed. Recognizing these limitations, I hold that Marine's present utilization of the ATM machine in Wegman's Canandaigua store constitutes the operation of a "branch" within the meaning of 12 U.S.C. Section 36(f) and such activities are, therefore, unlawful pursuant to 12 U.S.C. Section 36(c) in conjunction with New York Banking Law Section 105. Accordingly, plaintiffs' motion for summary judgment is granted and Marine is permanently enjoined from utilizing the Canandaigua Wegman's ATM to allow its customers to make deposits or withdrawals from Marine Midland accounts or to receive cash advances from Marine Midland credit card accounts. However, I hold that Wegman's ownership and maintenance of the ATM in Canandaigua does not constitute illegal banking in violation of New York Banking Law Section 131.1 and summary judgment is entered in favor of Wegman's dismissing the complaint.

ALL OF THE ABOVE IS SO ORDERED.