757 F.2d 453
 53 USLW 2434, 1 Fed.R.Serv.3d 1045
 INDEPENDENT BANKERS ASSOCIATION OF NEW YORK STATE, INC., the
Canandaigua National Bank and Trust Company,
Plaintiffs-Appellees, Cross-Appellants,
v.
MARINE MIDLAND BANK, N.A., Wegmans Food Markets, Inc., Defendants,
Marine Midland Bank, N.A., Defendant-Appellant,
Wegmans Food Markets, Inc., Defendant-Cross-Appellee.
 Nos. 189, 222, Docket 84-7424, 84-7448.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 6, 1984.
Decided Feb. 27, 1985.
 
 Paul K. Stecker, Buffalo, N.Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Allen R. Bivens, Buffalo, N.Y., of counsel), for defendant-appellant Marine Midland Bank, N.A.
 Michael R. Wolford, Rochester, N.Y. (Nixon, Hargrave, Devans & Doyle, John R. Tyler, Jr., Paul S. Speranza, Jr., Rochester, N.Y., of counsel), for defendant-cross-appellee, Wegmans Food Markets, Inc.
 Kevin S. Cooman, Rochester, N.Y. (Greisberger, Zicari, McConville, Cooman & Morin, P.C., Richard A. Dollinger, Rochester, N.Y., of counsel), for plaintiffs-appellees and cross-appellants, Independent Bankers Ass'n of New York State, Inc. and The Canandaigua Nat. Bank and Trust Co.
 William Hughes Mulligan, Vaughn C. Williams, Lawrence J. Block, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel, for Mastercard Intern., Inc., amicus curiae.
 Richard K. Willard, Acting Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., L. Robert Griffin, Ronald R. Glancz, Eugene M. Katz, Office of Comptroller of the Currency, Attys., Washington, D.C., Richard M. Ashton, Carl V. Howard, Attys., Bd. of Governors of the Federal Reserve System, Washington, D.C., Robert N. Davenport, Madeline J. Rivlin, Attys., Federal Reserve Bank of New York, New York City, of counsel, for the Comptroller of the Currency and Bd. of Governors of the Federal Reserve System, amici curiae.
 David Crump, Professor of Law, South Texas College of Law, Houston, Tex., Roger Boyle, Robert Steven Anderson, Boyle, Vogeler & Haimes, New York City, of counsel, for The Legal Foundation of America, amicus curiae.
 Paul A. Allen, Vice President & General Counsel, Plus System, Inc., Denver, Colo., Donald I. Baker, Sutherland, Asbill & Brennan, Washington, D.C., of counsel, for Plus System, Inc., amicus curiae.
 Roland E. Brandel, Steven S. Rosenthal, Philip D. Bartz, Morrison & Foerster, Washington, D.C., Drew V. Tidwell, Marcia Sullivan, Consumer Bankers Ass'n, Arlington, Va., of counsel, for Consumer Bankers Ass'n and The California Bankers Clearing House Ass'n, amici curiae.
 Stanton R. Koppel, Visa U.S.A. Inc., San Francisco, Cal., John D. Hawke, Jr., James R. McAlee, Mark J. Spooner, Mark P. Gergen, Arnold & Porter, Washington, D.C., of counsel, for Visa U.S.A. Inc., amicus curiae.
 Noel H. Nation, P.A., Maura J. Abeln, Marianne Hurd, Steel, Hector & Davis, Miami, Fla., of counsel, for Florida Interchange Group, Inc., Georgia Interchange Network, Inc., Mid Atlantic Exchange, Inc., Money Station, Inc., EFT Group, Inc., amici curiae.
 Henry M. Polmer, Lucinda O. McConathy, G. Michael Epperson, Bell, Boyd & Lloyd, Washington, D.C., of counsel, for Electronic Funds Transfer Ass'n, amicus curiae.
 Before FEINBERG, Chief Judge and NEWMAN and PRATT, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 Defendant Marine Midland Bank, N.A. (Marine) appeals from a judgment of the United States District Court for the Western District of New York, Michael A. Telesca, J., enjoining it from using an automated teller machine (ATM) owned and operated by Wegmans Food Markets Inc. (Wegmans) and located in Wegmans' store in Canandaigua, New York. 583 F.Supp. 1042 (W.D.N.Y.1984). The judgment was entered on a motion for summary judgment in a suit brought by plaintiffs Independent Bankers Association of New York State, Inc. (Bankers Association) and the Canandaigua National Bank and Trust Company. The district court held that Marine's use of the ATM constituted unauthorized branch banking under applicable federal law. Plaintiffs cross-appeal from the court's dismissal of their pendent claim; the court held that defendant Wegmans' ownership and operation of the ATM did not violate state banking law. For reasons stated below, we reverse on the federal claim and dismiss the pendent state claim.
 
 I. Facts
 
 2
 Marine is a federally chartered bank. Wegmans owns a chain of grocery stores, including 31 at which it has installed an ATM. Wegmans made these electronic banking services available in order to attract customers and support a high-volume grocery business. In January 1983, Marine entered into an agreement with Wegmans that permitted Marine depositors to use the ATM located in the Wegmans Canandaigua store. Canandaigua has a population of approximately 11,000, and is the principal office of plaintiff Canandaigua National Bank.
 
 
 3
 The ATM in the Canandaigua store has Wegmans' logo on it, is under Wegmans' control and is a shared ATM, that is, it may be used by many financial institutions. Marine's account-holders may use the ATM to make deposits and cash withdrawals, obtain cash advances against credit cards, transfer funds between accounts, pay bills and obtain account balance information.
 
 
 4
 Wegmans is obligated under the agreement with Marine to load the machine with cash, provide deposit envelopes and other customer forms, issue transaction receipts, unload and deliver deposit containers and provide security, insurance and maintenance services.
 
 
 5
 To use the machine, a customer inserts an encoded plastic card and enters a personal identification number on the machine's keyboard. The customer then enters the desired transaction and amount. Deposits are placed in envelopes marked "Wegmans Electronic Teller Deposit/Payment Envelope" and dropped through a slot in the machine into a secured deposit box maintained by Wegmans. The customer receives a receipt marked "Electronic Teller Wegmans," which reflects the amount indicated on the keyboard. Account withdrawals must first be approved electronically, and cash is then disbursed by the machine.
 
 
 6
 Marine, Wegmans and several financial institutions are members of a shared ATM network known as HarMoney. HarMoney's members share the use of central computer processing facilities--a "switch"--owned by Marine. Customers of the member institutions can use other members' ATM's to transact business with their own institutions. Wegmans also belongs to another shared ATM network, Metroteller, which has 45 financial institution members in New York and other states. The crediting and debiting of the accounts of customers who use the Wegmans machine occurs through a series of transactions involving the relevant switch.
 
 
 7
 Plaintiff Bankers Association is a non-profit association of over 90 member banks, including plaintiff Canandaigua National Bank. Plaintiffs brought suit in the Western District in September 1983, alleging that Marine's use of Wegmans' ATM constituted branch banking under the McFadden Act, 12 U.S.C. Sec. 36(f), and thus violated section 36(c) of the Act, which incorporates by reference the restriction on branch banking contained in New York Banking Law Sec. 105. This section prohibits a bank from opening a branch in any community with a population of 50,000 or less that is the principal office of another bank (home office protection). Plaintiffs included a second, pendent state claim against Wegmans, alleging that it was conducting a banking business, although not authorized to do so, in violation of New York Banking Law Sec. 131.1. Plaintiffs sought declaratory and injunctive relief.
 
 
 8
 Wegmans moved to dismiss the pendent state claim for lack of subject matter jurisdiction. In an opinion reported at 575 F.Supp. 1425 (W.D.N.Y.1983), the district court denied the motion, holding that the facts alleged were sufficient to confer pendent jurisdiction. Plaintiffs and defendant Marine each moved for summary judgment; in April 1984, the district court granted plaintiffs' motion on the federal claim. The court permanently enjoined Marine from utilizing the Wegmans ATM in Canandaigua for Marine bank account and credit card account transactions; the court held that such use constituted unlawful branch banking under the applicable provisions of the McFadden Act. On the pendent state claim, the court granted summary judgment for Wegmans on the ground that Marine was doing the banking, and Wegmans, at most, was "acting as an agent for a bank, and not as a banking institution itself." 583 F.Supp. at 1049. This appeal by Marine and cross-appeal by plaintiffs followed.
 
 II. Background
 
 9
 Analysis of the issues before us requires a description of the statutory scheme. The McFadden Act authorizes national banking associations to "establish and operate new branches" to the extent permissible for state banks under state law. 12 U.S.C. Sec. 36(c). The term "branch" is defined by the Act
 
 
 10
 to include any branch bank, branch office, branch agency, additional office, or any branch place of business ... at which deposits are received, or checks paid, or money lent.
 
 
 11
 12 U.S.C. Sec. 36(f).[1] Such branches may be established "with the approval of the Comptroller of the Currency ... at any point within the State in which said [banking] association is situated," 12 U.S.C. Sec. 36(c)(2). The relevant state law incorporated by reference in this case permits banks to "open and occupy one or more branch offices" within the state, but, as already indicated, the state law also provides for home office protection. New York Banking Law Sec. 105.[2] It is this restriction that Marine violated, according to the district court, by establishing its "branch" in Canandaigua through use of the Wegmans ATM.
 
 
 12
 The McFadden Act was an amendment to the National Bank Act, which was enacted in 1864 and governs the establishment and operation of federally chartered banks. The McFadden Act was passed in 1927, and amended in 1933, as part of a Congressional effort to strengthen national banks and enable them to compete on an equal footing with their state-chartered counterparts. Faced with the expansion of state banks, which were permitted to open branches by recently liberalized state laws, many banks had withdrawn from the Federal Reserve System. 65 Cong.Rec. 11297 (1924). The McFadden Act was designed, in part, to stem this tide by granting similar privileges to national banks. See First National Bank of Logan v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), reviewing the history of the McFadden Act.
 
 
 13
 The compromise that emerged from the Congressional debates incorporated the branching laws of the states into the National Bank Act. National banks were authorized to open branches only "if such establishment and operation [were] at the time authorized to State banks by the statute law of the State in question ...." 12 U.S.C. Sec. 36(c). However, Congress retained some federal authority over branching by including the definition of "branch" in the statute, 12 U.S.C. Sec. 36(f). See supra note 1. In First National Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), the Court held that the threshold question of what constitutes a "branch" is governed by federal, not state, law and noted that the definition "must not be given a restrictive meaning which would frustrate the congressional intent." 396 U.S. at 134, 90 S.Ct. at 343. The reason is that
 
 
 14
 to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable result ....
 
 
 15
 396 U.S. at 133-34, 90 S.Ct. at 343-44.
 
 
 16
 Determination of whether a particular banking practice constitutes "branching" under sections 36(c) and (f) is thus the task of the federal courts, and it has proved to be a thorny one. Banking, like other industries, has changed radically since the McFadden Act was passed in 1927. "Brick and mortar" banking, with a single physical locus of bank-customer transactions, has been supplemented by many other forms of communication that could not have been contemplated in 1927. In the past two decades in particular, the industry has been transformed by the advent of computer technology. N. Penney & D. Baker, The Law of Electronic Fund Transfer Systems p 1.01 (1980); Fraser, Structural and Competitive Implications of Interstate Banking, 9 J.Corp.L. 643 (1984).
 
 
 17
 In 1969, the Supreme Court concluded that a mobile armored car and an off-premises deposit receptacle, both owned and operated by a bank, constituted branch banking under section 36(f). Plant City, supra. Seven years later, in Independent Bankers Association of America v. Smith, 534 F.2d 921 (D.C.Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976), the questions raised were more complex. The Office of the Comptroller of the Currency (Comptroller), charged with enforcement of the National Bank Act, had issued an interpretive ruling in 1974 authorizing national banks to establish off-premises customer-bank communication terminals (CBCT's) without regard to the restrictions on branching contained in federal law. (We are informed by the Comptroller that an ATM is one form of a CBCT.) The Comptroller's position was that CBCT's were basically means of communication, not places where the banks transacted business, and therefore were not "branches" within the meaning of section 36(f) of the McFadden Act. 39 Fed.Reg. 44,416 (Dec. 24, 1974); 12 C.F.R. Sec. 7.7491 (1975).
 
 
 18
 The legality of this ruling was challenged by numerous parties, and the district court held the ruling invalid and enjoined its implementation. On appeal, the District of Columbia Circuit examined this new computer banking technology, analyzing each of the terminal's functions and comparing them to the definitional terms in section 36(f) of the Act, quoted above. The court concluded that
 
 
 19
 any facility that performs the traditional bank functions of receiving or disbursing funds is a "branch" of a national bank within the meaning of Section 36(f) if (1) the facility is established (i.e., owned or rented) by the national bank, and (2) it offers the bank's customers a convenience that gives the bank a competitive advantage over other banks (national or state) that do not operate similar facilities. (emphasis supplied)
 
 
 20
 Smith, supra, 534 F.2d at 951-52. Accordingly, the court held that the Comptroller's interpretive ruling was invalid. Thereafter, several circuits followed the reasoning of Smith and held that similar terminals established by national banks were branches and thus subject to federal and state restrictions on branch banking. Colorado ex rel. State Banking Board v. First National Bank of Fort Collins, 540 F.2d 497 (10th Cir.1976), cert. denied, 429 U.S. 1091, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977); Missouri ex rel. Kostman v. First National Bank in St. Louis, 538 F.2d 219 (8th Cir.), cert. denied, 429 U.S. 941 (1976); Illinois ex rel. Lignoul v. Continental Illinois National Bank and Trust Co., 536 F.2d 176 (7th Cir.), cert. denied, 429 U.S. 871, 97 S.Ct. 184, 50 L.Ed.2d 151 (1976); see also State Bank of Fargo v. Merchants National Bank and Trust Co., 593 F.2d 341, 344 (8th Cir.1979).
 
 
 21
 Smith, however, did not stem the tide of change in banking practices. It comes as no surprise that the economic pressure for modernization of banking has not receded. In the words of one treatise, the "payment systems genie that has been released from the electronic bottle" has refused to disappear. N. Penney & D. Baker, supra, p 1.01, at 1-2. As might be expected, Smith also failed to end the legal battles growing out of the new technology.
 
 
 22
 Shortly after the Supreme Court denied certiorari in Smith, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976), the Comptroller issued regulations governing the establishment of CBCT's. In the introduction to the amendments, the Comptroller stated that they were based upon the holding in Smith that a CBCT owned or rented by a national bank is subject to the branching restrictions of the McFadden Act. 41 Fed.Reg. 48,333 (Nov. 3, 1976). But, equally important, the introduction also stated that these restrictions did not apply to CBCT's that banks do not "own or rent," and have thus not "established." Id. Thereafter, the Comptroller's staff issued a series of interpretive letters along similar lines. Finally, in July 1981, the Comptroller published a proposed regulation formally incorporating his 1976 interpretation that an ATM is not a branch of a national bank unless the bank owns or rents it. 46 Fed.Reg. 38,925 (July 30, 1981). In July 1982, the Comptroller adopted the regulation (the Regulation). It provides in relevant part:
 
 
 23
 A "CBCT branch" is an automated device, established (i.e., owned or rented) by a national bank at a location separate from the main office or a domestic branch, that:
 
 1. Takes deposits, or
 2. Disburses cash drawn against:
 
 24
 (i) A customer's deposit account, or
 
 
 25
 (ii) A customer's pre-approved loan account.
 
 
 26
 12 C.F.R. Sec. 5.31(b) (1984) (emphasis supplied). Defendant Marine entered into the agreement with Wegmans not long after the Regulation was adopted, obviously on the assumption that by sharing the use of an ATM owned and operated by Wegmans, Marine would not "establish" a "branch" in Canandaigua.
 
 III. Marine's appeal
 
 27
 With this background in mind, we turn to the issues raised by defendant Marine's appeal. It is clear that whether a particular facility is a branch established and operated by a national bank under the McFadden Act is a question of federal law, that home office protection is one of New York State's restrictions as to location incorporated by reference in the McFadden Act, that plaintiff Canandaigua National Bank enjoys such protection and that Marine is therefore barred from establishing and operating a branch in Canandaigua. Thus, the key issue is whether the shared ATM in the Wegmans store in Canandaigua is a branch established and operated by Marine.
 
 
 28
 Marine argues that an electronic connection to a machine that is owned and operated by a supermarket and shared by numerous other financial institutions is not what Congress meant by "establishment" of a "branch." Marine alleges that its customers' use of Wegmans' ATM is not significantly different from their use of Wegmans' manual check cashing services, or banking by mail or telephone. Plaintiffs Banking Association and Canandaigua National Bank argue that use of Wegmans' ATM by Marine customers is a kind of electronic branch banking that falls squarely within the McFadden Act's definition of a branch, since Wegmans' ATM functions for Marine's account holders as a "place of business ... at which deposits are received [and] checks paid." 12 U.S.C. Sec. 36(f), see supra note 1. Both Marine and plaintiffs find support in the decision in Smith. Plaintiffs say that the District of Columbia Circuit used a functional analysis to determine the nature of a branch, and that the same method compels the conclusion here that Wegmans' ATM is a Marine branch. Marine claims that the Comptroller's Regulation used the precise language of Smith in exempting from the definition of "branch" an ATM not "owned or rented" by a national bank. Plaintiffs respond by characterizing this phrase as merely a "three-word parenthetical comment"; Marine answers that the "owned or rented" standard was central to the holding in Smith and was intended to provide a bright line test.
 
 
 29
 Resolution of these issues is not simple. The question before us is one of statutory construction. Therefore, we start with the language of 12 U.S.C. Sec. 36(c) and (f) to divine the meaning of the phrase "establish and operate" a "branch." The parties argue that the plain meaning of these terms requires a particular result, but such arguments, by focusing on different phrases in the relevant sections, seem to balance each other off. As indicated, plaintiffs say that the Wegmans ATM is a place at which deposits are received and checks paid for Marine account holders, within the meaning of subsection (f). But it is pointed out in response that, in the words of subsection (c), Marine did not "establish" and does not "operate" the ATM in Canandaigua; Wegmans did, and does. We do not believe that the issue can be resolved for either side so simply. The meaning of the phrase "establish and operate" is affected by the ambiguity of the definition of its object, "branch." More fundamentally, Congress in 1927 could not possibly have foreseen the current revolution in banking practices. The McFadden Act pre-dated the invention of computers as well as their application to banking through electronic funds transfer systems. Banking is no longer confined to physical transactions. A rigid application of the language of 1927 to the new technology fails to confront the economic realities facing a court, and leads to anomalous results.
 
 
 30
 We see no way neatly to categorize all of the various modern ways of accomplishing banking transactions so that it will be clear (or logically distinct) which ones constitute branch banking within the meaning of 12 U.S.C. Sec. 36(f) and which ones do not. If Wegmans' supermarket cashes a check and at the same time telephones the bank to guard against insufficiency of funds in the customer's account, apparently there is no branch; if the same functions are instantly performed by an automated teller, plaintiffs claim that there is a branch. Furthermore, the ATM networks at issue here are not even the cutting edge of the new technology. The wave of the future includes point-of-sale terminal systems (POS) and home computer banking. In the use of POS's, funds are electronically transferred directly from the customer's account to the retailer's account without the use of cash or checks. N. Penney & D. Baker, supra, p 7.01, at 7-2. It would defy common sense to consider a personal computer a branch, yet home banking by computer is already available and may soon offer some of the functions performed by Wegmans' ATM, including those arguably covered by the definition in section 36(f). The technology for such systems already exists. Frieder, Legislating for Interstate Bank Expansion: Financial Deregulation and Public Policy, 9 J.Corp.L. 673, 739 (1984).
 
 
 31
 Since the language of the statute is not determinative, we turn to two alternate sources of guidance--first, legislative intent at the time the McFadden Act was passed, Cass v. United States, 417 U.S. 72, 77-79, 94 S.Ct. 2167, 2170-2171, 40 L.Ed.2d 668 (1974), and second, the views of the executive agency charged with the Act's enforcement. As to the former, it is clear that the governing principle behind the McFadden Act was to strengthen national banks and achieve approximate competitive equality between the state and national banking systems. In the words of Representative McFadden, the Act's major sponsor,
 
 
 32
 As a result of the passage of this act ... the national banks are able to meet the needs of modern industry and commerce and competitive equality has been established among all member banks of the Federal reserve system.
 
 
 33
 68 Cong.Rec. 5815 (1927). Indeed, the parties before us agree that the Act sought to insure rough competitive equality between state and national banks. They disagree, however, about the impact on this objective of defining a shared ATM system as a branch.
 
 
 34
 Plaintiffs insist that failure to characterize the Wegmans-Marine arrangement as a branch gives national banks a significant competitive advantage over state banks, since the latter are barred by the New York Banking Law from using ATM's in home office protected communities. An amendment to New York Banking Law, section 105-a, was passed after the opinion below was issued, and became effective on October 8, 1984. It authorizes banks to conduct banking at ATM's, point-of-sale terminals and "similar facilities," and states generally that "[s]uch facilities shall not be deemed to be branches," but with the proviso that in home office protected communities they "shall be deemed to be branches."[3]
 
 
 35
 On the other hand, Marine argues that if we affirm the district court's ruling that the ATM at Wegmans is a Marine branch, state banks will gain a competitive advantage. Marine claims that New York State banks are authorized to use ATM's in any state in the nation that permits their use; national banks, however, will be barred from offering ATM access across state lines, since the McFadden Act allows the establishment of branches only "within the State in which said association is situated." 12 U.S.C. Sec. 36(c)(2). Some state-chartered members of plaintiff Bankers Association, for example, would thus be insulated from competition in their home communities, yet might be free to offer ATM services in other states without competition from national banks. This could be a considerable marketing advantage, not merely a theoretical one, since numerous states have issued rulings or passed legislation permitting ATM usage, in some instances excluding it from the usual limitations on branch banking.[4] Thus, it appears that if shared ATM usage is deemed the "establishment" of a "branch" for purposes of federal law, national banks will be prohibited from the interstate activities facilitated by such laws, for the reasons given above. This will limit the ability of national banks to compete in the use of major technological developments in this industry, contrary to Congressional purpose.
 
 
 36
 We would feel uneasy, however, resting our decision primarily on a determination of economic impact that we are ill-equipped to assess. Accordingly, we turn to the interpretation of the McFadden Act by the administrative agency charged with its enforcement. Ordinarily, the agency's view would be entitled to "considerable respect," Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980), and we believe that this is particularly appropriate here. Fashioning policies in response to events that were unforeseeable when the legislation was written is one of the primary functions of executive agencies. American Trucking Ass'ns v. United States, 344 U.S. 298, 309-10, 73 S.Ct. 307, 314-315, 97 L.Ed. 337 (1953). The Comptroller has determined that an ATM that is not "owned or rented" by a national bank is not a branch under sections 36(c) and (f) of the Act. We think that considerable deference should be accorded to this view. Securities Industry Ass'n v. Board. of Gov. Fed. Reserve System, --- U.S. ----, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984); Chevron, U.S.A., Inc. v. Natural Resources Defense Council, --- U.S. ----, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). This construction need not be the only permissible one, nor the one that we necessarily would have adopted in an initial review. Chevron, supra, 104 S.Ct. at 2782 n. 11; FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). But absent compelling evidence that the agency's regulation is erroneous, arbitrary, or clearly unsupported by the statute, judicial deference is appropriate. CBS v. FCC, 453 U.S. 367, 390, 101 S.Ct. 2813, 2827, 69 L.Ed.2d 706 (1981). Here, as best we can tell, the agency's interpretation in fact appears to promote the purposes of the McFadden Act.
 
 
 37
 Courts should be particularly cautious where the regulated parties have relied on the agency's ruling and would be harmed by a reversal. Zenith Radio Corp. v. United States, 437 U.S. 443, 457-58, 98 S.Ct. 2441, 2448-49, 57 L.Ed.2d 337 (1978). Marine and numerous amici inform us of the substantial growth of shared ATM networks in the past decade, see ATM's 1984 Worldwide: The Nilson Report Annual Survey of Automated Teller Machines and Debit Cards (3d ed. 1984), and the reliance by national banks and other parties on the Comptroller's post-Smith rulings. Congress has passed several pieces of banking legislation since 1976 when Smith was decided, but has not overruled the Comptroller's contemporaneous interpretation of that decision. Nor has Congress moved to further define the permissible scope of national bank participation in electronic funds transfer systems, despite numerous suggestions that it do so. See Geographic Restrictions on Commercial Banking in the United States, The Report of the President 17-20 (1981).[5] Such inaction lends further weight to our inclination to defer to the Comptroller's view. NLRB v. Hendricks County Rural Electric Membership Corp., 454 U.S. 170, 177, 102 S.Ct. 216, 222, 70 L.Ed.2d 323 (1981).
 
 
 38
 It is true that the Regulation uses a distinction that is perhaps arbitrary, even if it does track the language of Smith. Whether an ATM is "owned" or "rented" or simply "used" by a bank may be more a matter of how agreements are structured than a reliable determinant of whether or not the ATM constitutes a "branch." On the other hand, the differences between a Wegmans machine and a Marine branch office are significant. Marine determines where a branch office will be located in light of its own judgment concerning banking needs; Marine owns or rents the facility and maintains it; Marine controls customer access and publicly identifies the facility as its own. With Wegmans' ATM, however, Wegmans decided to install it to attract customers for its store; Wegmans owns the machine and maintains it; Wegmans apparently decides whether to allow customers of different banks to use it; and customers do not view the machine as belonging to Marine. Moreover, the Smith court's use of the "owned or rented" phraseology seems to have been more than an off-handed parenthetical, as alleged by plaintiffs. The phrase is used not just once in the Smith opinion, but twice. See 534 F.2d at 941, 951. In addition, the Smith court apparently recognized, 534 F.2d at 941, 946 n. 98, that without the requirement that a facility be "established (i.e., owned or rented)," the definition of "branch" would be broad enough to include almost any means of communicating instructions to a bank and in theory could bar such accepted conveniences as banking by mail and banking by telephone. Finally, definitions that draw a line between what is permitted and what is not are frequently arbitrary, but lines still must be drawn and this one has the advantage of being a bright one. For these reasons, the Comptroller's definition of "branch" in the 1982 Regulation is a reasonable construction of the McFadden Act.
 
 
 39
 In sum, the precise language in the Smith opinion, the Comptroller's consistent rulings since 1976 culminating in the Regulation, and the obviously substantial, although relatively recent, reliance of the industry on the language in Smith and on the Comptroller's rulings and Regulation all suggest that the district court's interpretation of the McFadden Act here was incorrect. We agree with the court's observation that "a perfect solution may not be within the power of the judiciary and may better be left to the legislative branch ...." 583 F.Supp. at 1044. But the consequences of legislative inaction, it seems to us, work against plaintiffs, who are swimming against the current of technological development. We are told that the electronic facilities now mushrooming all over the country will furnish the consumer with greater convenience in banking at lower cost, and that these new methods are necessary for our country's future commercial development. We do not know whether this is so. Certainly, whether these new payment systems are desirable is not a decision for a court to make. It does seem, however, that there is a significant consumer demand inviting banks to move in that direction. Given the technological promise of interstate electronic banking and the substantial steps already taken toward achieving it, if the momentum already developed should be stopped, it should be done by Congress, and not by this court, particularly when the barrier we are asked to impose would be based upon definitions framed over 50 years ago.
 
 
 40
 Should Congress find itself in disagreement with the Comptroller's Regulation, which we accept as a legitimate interpretation of the governing statute, a legislative solution is available. Pending such an update of the 1927 Act, we hold that a national bank's usage of a shared ATM, which it does not own or rent, does not constitute the establishment and operation of a branch under sections 36(c) and (f) of the McFadden Act.
 
 
 41
 Plaintiffs also contend, however, and the district court agreed, that Marine has established a branch in Canandaigua even under the Comptroller's Regulation on the theory that the transaction fees Marine paid to Wegmans for each use of the ATM by Marine customers constitute "rent." We do not agree that this is "rent" in any colloquial or legal sense of the word. The fees do not grant Marine, or the other participating financial institutions, any proprietary or leasehold interest in the machine--even on a temporary basis. The transaction fee is more akin to the charge incurred for a phone call. It is a per unit cost for electronic access, by multiple parties, to equipment owned and operated by another party.
 
 
 42
 The Comptroller made a similar determination in a 1981 interpretive letter, which states that:
 
 
 43
 a national bank which makes regular use of a facility but has no property interest in the facility has not established a branch. Thus, banks only paying a transaction fee for the use of a facility need not file branch applications; the use of the facility is analogous to the use of a mail box or post office ....
 
 
 44
 Comptroller Staff Interpretive Letter No. 188 (May 12, 1981), [1981-82 Transfer Binder] Fed. Banking L.Rep. (CCH) p 85,269. This view, which was codified in the Comptroller's Regulation, 12 C.F.R. Sec. 5.31(g)(4), appears to be eminently sensible. Plaintiffs argue, in effect, that all of the financial institutions that join shared ATM networks are simultaneously renting all of the ATM's electronically connected to those networks. This makes the word "rent" so broad as to be meaningless.
 
 
 45
 Accordingly, we conclude that Marine's use of the Wegmans shared ATM, which Marine neither owns nor rents, does not constitute the establishment and operation of a branch under the McFadden Act.
 
 IV. Plaintiffs' cross-appeal
 
 46
 Plaintiffs cross-appeal from the ruling of the district court that Wegmans' provision and maintenance of the Canandaigua ATM does not violate New York Banking Law Sec. 131.1. That statute provides that only a bank may
 
 
 47
 employ any part of its property, or be in any way interested in any fund which shall be employed for the purpose of receiving deposits, making discounts, receiving for transmission or transmitting money in any manner whatsoever ....
 
 
 48
 In their pendent claim, plaintiffs alleged that Wegmans is conducting a banking business without the requisite state authorization, and should be enjoined from doing so.
 
 
 49
 Wegmans' initial response to plaintiffs' complaint was a motion to dismiss the pendent claim for want of federal jurisdiction. The district court rejected this challenge and held that the claim satisfied the two-part test of United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), for proper exercise of federal court jurisdiction over a pendent state claim. 575 F.Supp. at 1427-30. The criteria set forth in Gibbs are whether the federal court has the power to decide the state law question, and, if so, whether the court, in its discretion, deems it appropriate to exercise that power in the particular case. Gibbs, supra, 383 U.S. at 725-27, 86 S.Ct. at 1138-40; Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 809 (2d Cir.1971).
 
 
 50
 On the first issue, the district court concluded that the operation of the ATM in Wegmans' store in Canandaigua is the "common nucleus of operative fact," Gibbs, supra, 383 U.S. at 725, 86 S.Ct. at 1138, that forms the basis of both the federal and state claims. Under these circumstances, the court found pendent party jurisdiction despite the absence of an independent basis of federal jurisdiction over Wegmans. Leather's Best, supra, 451 F.2d at 809-10; Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627, 629-30 (2d Cir.1971). The district court then decided, in its discretion, that the interests of judicial economy and convenience, as well as fairness to litigants, would be served if the entire case were "heard in an expeditious manner in one forum." 575 F.Supp. at 1430.
 
 
 51
 Shortly thereafter, plaintiffs and Marine both moved for summary judgment. Wegmans did not so move, but in April 1984, the district court granted summary judgment for plaintiffs on the federal claim and for Wegmans on the state law claim. The court found plaintiffs' pendent claim to be "tenuous," particularly in view of plaintiffs' inability
 
 
 52
 to present any New York caselaw which even remotely suggests that Wegman's activities constitute "banking" under Section 131.1. This alone could be construed as supporting the legality of Wegman's activities, and is accented by the fact (pointed out by Wegman's) that these machines have been in operation for over ten (10) years.
 
 
 53
 583 F.Supp. at 1049. The court went on to hold that
 
 
 54
 At most, Wegman's is acting as an agent for a bank, and not as a banking institution itself. Thus, the policy behind Section 131.1, to confine banking functions to government chartered, regulated and inspected institutions ... is in no way abrogated by Wegman's ownership and maintenance of the ATM machine in the Canandaigua store, for it remains the chartered, regulated and inspected banks that are doing the banking--not Wegman's.
 
 
 55
 Id.
 
 
 56
 We agree that the district court had power to exercise pendent party jurisdiction over the state claim. Leather's Best, supra; Astor-Honor, supra. We question, however, the wisdom of adjudicating this important state law question in federal court apparently before any New York State court has passed on it. Gibbs expressly warned that
 
 
 57
 Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.
 
 
 58
 383 U.S. at 726, 86 S.Ct. at 1139. The propriety of non-bank ownership of ATM's falls squarely within the province of the New York state regulatory scheme for licensing banks. We think this is precisely the type of novel and unsettled state law question that deserves a "surer-footed" state court adjudication. Gregory v. Mitchell, 634 F.2d 199, 202 (5th Cir.1981). Our holding here that Marine's activities are not branch banking under federal law lends even greater significance to the state law question and to the interests of New York State in defining the scope of its regulatory scheme.
 
 
 59
 Courts of appeals rarely reverse a discretionary district court exercise of pendent jurisdiction, Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1180 n. 5 (2d Cir.1974), but we believe that the circumstances of this case are unusual enough to justify that course. The factors to be weighed in the district court's discretionary decision are judicial economy and convenience, fairness to the parties and the degree of uncertainty in the relevant state law. Financial General Bankshares, Inc. v. Metzger, 680 F.2d 768, 776 (D.C.Cir.1982). Where the last factor clearly outweighs the others, and where potential harm to the litigants is either minimal or easily mitigated, appellate reversal of a district court may be appropriate. Financial General Bankshares, supra, 680 F.2d at 777-78; Rice v. President & Fellows of Harvard College, 663 F.2d 336, 339 (1st Cir.1981), cert. denied, 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982). In Financial General Bankshares, the District of Columbia Circuit held that the district court had abused its discretion in holding a 3-day trial on novel and unsettled state law questions after dismissal of the federal claims. The pendent claims there, as here, involved state law regulatory questions that had never been addressed by the state courts. 680 F.2d at 777. In this case, which was decided without trial on motions for summary judgment, we have even less concern about judicial economy. Plaintiffs can refile their state law complaint in state court, using the same documents submitted in support of their papers below. Financial General Bankshares, supra, 680 F.2d at 778.
 
 
 60
 We conclude, therefore, that the application of New York Banking Law to Wegmans' provision and maintenance of an ATM should be left to the courts of the state. Accordingly, the judgment below for Wegmans on the pendent claim is vacated, and the district court is instructed to dismiss that claim without prejudice.
 
 
 
 [1]
 The relevant portions of subsections (c) and (f) of section 36 provide:
 (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches:
 (1) ....
 (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State Banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.
 (d) ....
 (e) ....
 (f) The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business ... at which deposits are received, or checks paid, or money lent. (emphasis supplied)
 
 
 [2]
 Section 105 provides in relevant part:
 
 
 [1]
 No bank ... shall transact any part of its usual business of banking at any place other than its principal office, except that a bank or trust company may open and occupy one or more branch offices at any location in the state, provided: ... (ii) that, except for the city or village in which its principal office is located, in no event shall a branch be opened and occupied pursuant to this subdivision in a city or village with a population of fifty thousand or less in which is already located the principal office of another bank, trust company or national banking association
 
 
 [3]
 Section 105-a, as amended, provides:
 A bank or trust company, pursuant to resolution duly adopted by a majority of its board of directors, may conduct a banking business, at automated teller machines, point-of-sale terminals, and similar facilities subject to regulations which may be promulgated by the banking board. Such facilities shall not be deemed to be branches and shall not be subject to any of the provisions of this chapter applicable to branches; provided however that notwithstanding the foregoing, for purposes of clause (ii) of subdivision one of section one hundred five of this chapter, such facilities shall be deemed to be branches, and such facilities shall be subject to the terms and conditions of section one hundred five, and for purposes of section twenty-eight-b of this chapter, such facilities shall be deemed to be branches. (emphasis supplied)
 
 
 [4]
 Of the approximately 40 states that have enacted special legislation authorizing state-chartered institutions to use electronic terminals, more than 20, including New York, consider them not to be "branches." Like New York, however, some of these states do impose geographic restrictions on the deployment of the terminals. N. Penney & D. Baker, supra, p 22.01, at 22-12 to 22-14, n. 44 (1980 & 1983 Cum.Supp.)
 
 
 [5]
 The final Report of the National Commission on Electronic Fund Transfers, a commission established by Congress in 1974, recommended "that the rules governing the deployment of off-premise EFT terminals should be separate and distinct from and less restrictive than the rules regarding the establishment of conventional branches. (Unanimous voice vote in favor)." EFT in the United States, Policy Recommendations and the Public Interest 78 (1977). (emphasis in original)