**FLEET BANK, NATIONAL ASSOCIATION,**
**Plaintiff,**

v.

**The Honorable John P. BURKE, Banking Commissioner and Connecticut Department of Banking, A State Agency, Defendants.**

**No. 3:97CV133 (JBA).**

United States District Court,
D. Connecticut.

Sept. 30, 1998.

Daniel L. Fitzmaurice, Day, Berry & Howard, Hartford, CT, for Plaintiff.

William J. Prensky, Attorney General's Office, Finance & Public Utilities, Hartford,

John G. Haines, Attorney General's Office, Hartford, CT, for Defendants.

### RULING ON CROSS SUMMARY JUDGMENT MOTIONS
### [DOCS. # 24 & # 28]

ARTERTON, District Judge.

## INTRODUCTION

Fleet Bank ("Fleet") seeks by way of declaratory judgment a determination that John P. Burke, the State Banking Commissioner ("Commissioner") acting on behalf of the Connecticut Department of Banking is incorrect in his interpretation of Connecticut statutes, specifically C.G.S. § 36a–156, as precluding Fleet from imposing a transaction fee ("surcharge fee") on non-depositors who access their bank accounts via Fleet's Automatic Teller Machines ("ATMs").

Pending before the Court are the parties cross-motions for summary judgment. The Court has previously determined that *Pullman* abstention was not appropriate. *See* Ruling on Defendant's Motion to Dismiss dated Aug. 10, 1997 (doc. # 21).

## BACKGROUND

Fleet is a nationally-chartered bank that operates branches and ATMs in the State of Connecticut and in other states. (Joint Stipl. ¶ 2). The defendants are the Commissioner and the Connecticut Department of Banking, ("Banking Department") who are responsible for the general administration and implementation of the banking laws of the State of Connecticut pursuant to C.G.S. §§ 36a–1 to 36a–810.

Currently, Fleet owns and operates approximately 365 ATMs throughout the state of Connecticut as well as over 2,000 ATMs throughout Massachusetts, Maine, New Hampshire, Rhode Island, New York, New Jersey. (*See* Def. Memorandum of Law in support of Motion for Summary Judgment, App. A). Fleet is also a member of three ATM networks: CIRRUS, NYCE and PLUS. (Joint Stipl. ¶ 4) Through these networks, member banks like Fleet enable their depositors to access their accounts and transact business using another network bank's ATM. (Joint Stipl. ¶ 4). The advantage of these arrangements to the banks and to their depositors is that they increase the number of potential outlets where banking transactions may be conducted. As part of these networks, Fleet permits non-depositors who hold ATM cards issued by other network banks access to its ATMs. In return, Fleet depositors may access their accounts via ATMs maintained by any other bank within the network. Under these network arrangements, the member banks agree to uniform policies and rights including the type of charges permitted for using and accessing another member bank's ATM. (Joint Stipl. ¶ 4).

Under the current network arrangements, a host member bank potentially has three methods for defraying or recovering its costs of installing and operating its ATMs and of sharing them with other banks and their depositors. First, the host bank could impose an "interchange fee" on the network bank whose depositor accesses the host bank's ATM. (Joint Stipl. ¶ 6). Second, the host bank could impose a direct charge or "surcharge fee" on the non-depositor that accesses its ATM. (*Id.*) Finally, any network bank could impose a "transaction fee" on its own depositor for his or her use of any ATM in the network, including its own. Therefore, a single ATM transaction at a network bank could result in imposition of at least two different charges on the ATM user and one "interchange fee" on the user's bank. It is the second host bank fee, the "surcharge fee" on non-depositor users that is in dispute in this case.

On September 14, 1995, Fleet sought an opinion from the Commissioner "seeking confirmation ... that a state chartered bank permissively may charge a direct transaction fee for the use of such bank's ATM by a person who does not otherwise maintain a banking relationship with the bank ... to recoup a portion of the expenses incurred by the bank to establish and maintain the ATM" and "that the Connecticut statutes governing the use of ATMs in Connecticut would not place any restriction on the ability of a federally chartered bank in Connecticut to impose similar fees ...." (Joint Stipl. Ex. B) In his September 14, 1995 letter in response, the Commissioner reiterated his predecessor's

position adopted in 1988 (Joint Stipl. Ex. A) that "surcharge fees" were *not* permissible under Connecticut state banking laws. (Joint Stipl. Ex. B). The Commissioner, rejecting Fleet's position, opined as follows:

> The Connecticut statutes governing the establishment and use of ATMs do not authorize banks to impose the transaction fees described [. . .]. Moreover, Section 36a–156 of the Connecticut General Statutes specifically authorizes a bank that has established an ATM to impose a usage fee on other banks whose customers use the ATM to cover a reasonably proportionate share of all acquisition, installation and operating costs. It is an established rule of statutory construction that a statute which provides that a thing done in a certain way carries with it an implied prohibition against doing that thing in another way. *See State ex rel. Barlow v. Kaminsky*, 144 Conn. 612, 136 A.2d 792 (1957). Therefore, Section 36a–156, which provides a bank may charge another bank that uses its ATM a fee for its use, carries with it an implied prohibition against the bank imposing a fee on the customers of the other bank for such use. . . . A state-chartered or federally-chartered bank in Connecticut that wishes to recoup the expenses incurred in establishing and maintaining an ATM may do so by imposing the usage fee permitted under Section 36a–156 on other banks whose customers use the ATM.

(Joint Stipl. Ex. B).

The Commissioner interprets Connecticut's ATM statute as containing an implicit prohibition on Fleet's ability to charge non-depositors a surcharge fee for their use of Fleets ATMs. (*Id.*) It is the propriety of this interpretation of the Connecticut banking laws that is challenged by Fleet.

Connecticut banking laws include several provisions specifically related to the establishment and operation of ATMs in the state, C.G.S. §§ 36a–155 *et seq.* ("ATM statute"). These statutes address the following areas: 1) banks' and credit unions' establishment of ATMs and the banking commissioner authority to adopt regulations (C.G.S. § 36a–155(a)); 2) banks' access to others' ATMs for a fee (C.G.S. § 36a–156); 3) satellite devices and point of sale terminals not branch offices (C.G.S. § 36a–157); 4) use of ATMs by out of state banks and credit unions (C.G.S. § 36a–158); and 5) rights of banks and credit unions to establish and use point of sale terminals vis-a-vis national banks (C.G.S. § 36a–159).

The Commissioner has also applied the Depositor's Account Contract Act or ("DACA"), C.G.S. § 36a–316 through 329, to the use of ATMs by depositors. Although DACA does not explicitly refer to ATMs, it regulates the information and manner in which a bank must disclose to its depositors the amount of charges relating to their deposit accounts. Under the Commissioner's interpretation of DACA's definition section, C.G.S. § 36a–316(6)(D), a bank is permitted to charge its own depositors an ATM transaction fee, based on his construction that an ATM is "a device or method that may be used to withdraw money from a deposit account." (Joint Stipl. Ex. A). However, under the Commissioner's interpretation, DACA is inapplicable if the ATM user is not a depositor and thus, in the Commissioner's view, DACA provides no authority for the disputed "surcharge fee" for nondepositors' use of Fleet's ATMs.

## SUMMARY JUDGMENT STANDARD

When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other. "Rather the court must evaluate each party's motion on its merits, taking care in each instance to draw all inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

In this case, the parties have filed a joint stipulation of facts and neither side has identified any unresolved factual issues. (*See* Joint Stipl.) Furthermore, the Court has independently reviewed the record and concluded that there are no disputed facts and the dispositive issue is purely a question of statutory interpretation particularly appropriate for resolution by summary judgment. *Heublein, Inc.*, 996 F.2d at 1461.

## DISCUSSION

### I. Relation of state banking laws to federally chartered banks

 In Connecticut, there exist two types of banks, state-chartered and federally-chartered banks. Both types lack inherent power beyond those powers enumerated or incidentally conferred under the relevant federal (12 U.S.C. § 24) or state (C.G.S. § 36a–250) banking law. Fleet contends its authority to impose a "surcharge" fee on non-depositors who access its ATMs is found in the "incidental" powers granted under the National Banking Act, 12 U.S.C. § 24 (Seventh). (Complaint ¶¶ 10, 19). This provision of the National Banking Act authorizes a bank to:

> Exercise by its board of directors or duly authorized officers or agents, subject to the law all such incidental powers as shall be necessary to carry on the business of banking.

12 U.S.C. § 24(Seventh).

Furthermore, under 12 C.F.R. § 7.4002, Fleet claims that a national bank is expressly permitted to charge its customers non-interest charges and fees for the services the bank performs. Fleet claims that non-depositor ATM users qualify as "customers" and therefore may be assessed a surcharge fee.

 A national bank's enumerated and incidental powers are not normally limited by, but rather ordinarily pre-empt contrary state law. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (finding that federal law preempted Florida law which would have prohibited national banks from selling insurance). Nonetheless, federal banks are subject to state regulations provided they do not prevent or significantly interfere with the national bank's exercise of its powers. *See Anderson National Bank v. Luckett*, 321 U.S. 233, 248, 64 S.Ct. 599, 88 L.Ed. 692 (1944) ("national banks are subject to state laws, unless those laws infringe upon the rights and privileges of national banks"). However, not all differences between federal and state banking laws are deemed substantial conflicts implicating the doctrine of pre-emption and the issue of preemption would not arise unless the Court finds significant conflict between the Connecticut ATM statute and Fleet's claimed right under federal

law. However, the relief sought by Fleet is not confirmation that it does indeed have the authority to impose a surcharge under federal banking law, but rather only that the Connecticut ATM statutes do not prohibit such a fee. Only if the Court affirms the Commissioner's interpretation of C.G.S. § 36a–156 does it become necessary to determine what federal banking laws and regulations permit in order to assess the existence of conflict thus triggering a preemption analysis. Given the staged analysis required, the parties have agreed that determination of the plaintiff's pre-emption claims should be deferred.

### II. Standard of review of Commissioner's statutory interpretation

 In determining the correctness of the Banking Commissioner's interpretation of C.G.S. § 36a–156, the Court follows Connecticut's own rules of deference to its agency's statutory interpretation under circumstances where there has been no prior state judicial interpretation of the statute at issue. In general, federal courts give great deference to the judgment of administrative agencies that are in charge of enforcing the statute at issue. *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Similarly, Connecticut courts defer to the statutory interpretation of Connecticut administrative agencies with such enforcement powers. *Nichols v. Warren*, 209 Conn. 191, 202, 550 A.2d 309, (1988). However, the Connecticut Supreme Court has clarified that where a state statute is interpreted by a state administrative agency in the first instance, and has not previously been subjected to judicial scrutiny, such statutory construction is a question of law and the agency interpretation is not entitled to any special deference. *Id.* at 203, 550 A.2d 309; *Burinskas v. Dept. of Social Services*, 240 Conn. 141, 147, 691 A.2d 586 (1997). In this case, the Commissioner's statutory interpretation is not embodied in any enforcement regulation, guideline, policy statement, or administrative adjudication but is instead, the Commissioner's statutory interpretation in response to a private inquiry. Accordingly, under these circumstances, the

Court will construe the ATM statute at issue *de novo.*

## III. Statutory Construction

The Commissioner asserts that this statute's silence regarding other types of permissible ATM fees implies a legislative intent to restrict banks from collecting any other type of ATM fee, including one directly imposed by banks upon users of their ATMs. The Commissioner contends that the explicit creation of one form of charge for ATM use— the interchange fee permitted to be charged to other member banks—necessarily implies that all other types of ATM charges are precluded. Therefore, the Commissioner reasons that the grant of an express right to impose an interchange fee necessarily precludes the right of any bank to levy any additional fee, such as the disputed direct "surcharge fee."

As stated in its two opinion letters and reiterated throughout this litigation, the Commissioner bases its interpretation on the concept of *expressio unius est exclusio alterius*—"[t]he statutory interpretation meaning that the expression of one thing is the exclusion of another." Black's Law Dictionary 581 (6th ed.1990). In *Barlow v. Kaminsky,* 144 Conn. 612, 136 A.2d 792 (1957), the Connecticut Supreme Court, interpreting the governor's statutory power of appointment, found that "a statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way. An enumeration of powers in a statute is uniformly held to forbid things not enumerated." In relying upon *Barlow* and its progeny, the Commissioner contends that when the legislature authorized banks to charge an "interchange fee" for making their ATMs available to other banks, it implicitly limited the bank's ability to impose any other type of fee on the individual user.

However, application of *exclusio unius* is most appropriate when a statute demonstrates this intent by its enumeration of an exhaustive listing of specific powers. *Barlow,* 144 Conn. at 620, 136 A.2d 792. In contrast, C.G.S. § 36a–156 and the related ATM statutes do not purport to enumerate specific powers of banks with respect to their ability to directly impose individual ATM transaction fees and charges. The focus and purpose of C.G.S. § 36a–156(a), by its language is to ensure that banks share their ATMs nondiscriminatorily for which they are entitled to be compensated:

> (a) One or more banks, Connecticut credit unions or federal credit unions which have established a satellite device or point of sale terminal shall make the satellite device or point of sale terminal available on a nondiscriminatory basis for use by any other bank, Connecticut credit union or federal credit union, upon payment by each such other bank or credit union of a reasonably proportionate share of all acquisition, installation and operating costs of the satellite device or point of sale terminal. The satellite device or point of sale terminal shall identify with equal prominence all of the banks, credit unions or network systems which use the satellite device or point of sale terminal.

Unlike the pertinent federal and state statutes which enumerate the powers of national and state banks, the ATM statute does not purport to provide an exhaustive list of permitted ATM fees, thus undermining the Commissioner's theory of preclusion by silence. *See* C.G.S. § 36a–250 (enumerating the specific powers of Connecticut banks); 12 U.S.C. § 24 (1997) (enumerating the powers of national banks).

In addition, Connecticut courts have stated that "if the statutory language is clear and unambiguous... courts cannot, by construction read into statutes provisions which are not clearly stated." *Frazier v. Manson,* 176 Conn. 638, 642, 410 A.2d 475 (1979). Since the clear language of the statute only relates to the non-discriminatory access among ATMs, inferring the specific preclusive intent urged by the Commissioner is not justified. As one commentator has observed, the canon of *expressio unius est exclusio alterius* in the context of statutory interpretation "is a questionable one in light of the dubious reliability of inferring specific intent from silence." Cass R. Sunstein, *Law and Administration After Chevron,* 90 Colum. L.Rev.2071, 2109 n. 182 (1990).

Next, the Commissioner supports its statutory interpretation by reference to the legislative history, intended policy and surrounding circumstances of C.G.S. § 36a–156(a)'s passage. Although resort to legislative history is only necessary where a statute's language is ambiguous, which this statutory language is not, a review of the proffered legislative history results in the conclusion that it does not support the Commissioner's interpretation. The purpose and policy behind the ATM legislation when it was enacted in 1976 was to permit Connecticut state chartered banks the ability to compete with national chartered banks that were already permitted the ability to operate ATMs based on the Office of Comptroller of Currency's (OCC) interpretation of federal law. 18 Conn. H.R. Proc. pt. 10, 1975 Sess. 4868–4869. The legislative intent of § 36a–156(a) was to ensure that ATM machines, devices and terminals remained available to state banks and credit unions. *Id.*

■ The Commissioner references from the legislative history a single colloquy between Representatives Webber and Lyddy during General Assembly consideration of C.G.S. § 36a–156. Even though such floor debates on a statute under consideration are not controlling on statutory interpretation, the Court may take judicial notice of such legislative debate. *Iovieno v. Comm'r*, 222 Conn. 254, 608 A.2d 1174 (1992), *Tax Comm'r v. Estate of Bissell*, 173 Conn. 232, 377 A.2d 305 (1977).

REP. WEBBER (92nd): "Thank you. If one were to use this service at a supermarket, [sic] at the check-out counter, would that individual be charged a fee for the use of that service?"

THE DEPUTY SPEAKER: The gentlemen from the 126th if he cares to respond.

REP. LYDDY (126th): Through you Mr. Speaker. No.

THE DEPUTY SPEAKER: The gentleman from the 92nd.

REP WEBBER: (92nd): If I understand the answer correctly, if a bank installs this very sophisticated piece of equipment in a super market [sic] for the convenience or at least to alleviate the problems at a check-out counter and the equipment, from what Mr. Lyddy tells us is costly, there shall be no charge, and I ask the question again, to the customer who uses it?

THE DEPUTY SPEAKER: The gentleman from the 126th if you care to respond.

REP. LYDDY (126th): Through you Mr. Speaker. No.

18 Conn. H.R. Proc. pt. 10, 1975 Sess. 4870–4871.

■ Commissioner suggests that this exchange between two legislators indicates a generalized legislative intent of Section 36a–156. Although "statements made on the house floor of the legislature are strong indications of legislative intent," *Winchester Woods Assoc. v. Planning & Zoning Comm'n*, 219 Conn. 303, 310–11, 592 A.2d 953 (1991), these predictive opinions offered while the bill was under consideration are not demonstrably traceable to the statutory language and cannot otherwise be imputed as the intent of the other 127 members of the legislature who voted for its passage. *Pettigrew v. Thompson*, 135 Conn. 228, 233, 63 A.2d 154 (1948) ("[I]t is impossible to tell how far proceedings before a committee or the views if an individual member actually entered into the determination by the legislature to pass a certain law.") The Court thus concludes that the legislative history does not support the Commissioner's statutory interpretation.

## IV. Conclusion

Even though the Commissioner identifies some potentially anti-competitive and/or anti-consumer consequences of banks levying such "surcharge fees" in addition to other ATM transaction and interchange fees, the Court finds no Connecticut statute that prohibits their imposition. Given that the Connecticut ATM statute was enacted in 1976, long before many of the issues presented in this case could have been foreseen, the Court will leave to the state legislature and/or Congress any reexamination of the extent to which ATM fees should be regulated in light of the significant evolution in the use of electronic banking. As the Second Circuit observed with respect to issues under federal bank's use of ATMS under federal banking law: "...a perfect solution may not be within the power of the judiciary and may be better left to the legislative branch." *Independent Bankers Association of New York*

*State, Inc. v. Marine Midland Bank, N.A.,* 757 F.2d 453, 462 (2d Cir.1985).

Finally, since the Court does not find that C.G.S. § 36a–156(a) prohibits the imposition of surcharge fees, there is no need to address: 1) whether a national bank's authority to impose a surcharge fee falls within the "incidental powers" granted by the National Banking statute;[1] 2) whether a substantial conflict exists between the state and federal law, and 3) whether state law would be preempted by national banking law in this regard.

For the foregoing reasons, plaintiff Fleet's Motion for Summary Judgment [doc. # 24] is GRANTED and the defendant Commissioner and the Banking Department's cross motion for Summary Judgment [doc. # 28] is DENIED.

IT IS SO ORDERED.

---

1. Based on the *amicus curiae* brief submitted by the Office of Comptroller of Currency ("OCC"), the federal agency responsible for administering the federal banking policies, the Court notes the OCC's position that a federal bank such as Fleet does have such an "incidental power" to operate ATMs under 12 U.S.C. § 24 (Seventh), and corresponding permission to impose fees on services provide to any "customer" under 12 C.F.R. § 7.4002. Although "customer" is not currently defined under 12 C.F.R. § 7.4002, OCC's current plain language interpretation of "customer" is anyone who voluntarily uses a bank's ATM regardless of whether that user is a depositor. (See Brief of the Office of the Comptroller of Currency, p. 7).